**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **AMERICAN BEVERAGE** )<br>**CORPORATION** *and* )<br>**POUCH PAC INNOVATIONS, LLC,** )<br> )<br>Plaintiffs, )<br> )<br> )<br>v. )<br> )<br>**DIAGEO NORTH AMERICA, INC.** *and* )<br>**DIAGEO AMERICAS SUPPLY, INC.** )<br>*trading and doing business as* )<br>CAPTAIN MORGAN CO. )<br> )<br>Defendants. ) | CIVIL ACTION NO. 12-601 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**CONTI, District Judge**

I.  **INTRODUCTION**

Pending before the court is the Motion for Preliminary Injunction (ECF No. 8) and brief

in support (ECF No. 9) filed on May 7, 2012 by plaintiffs American Beverage Corporation

("ABC") and Pouch Pac Innovations, LLC ("PPi") (collectively "plaintiffs") against defendants

Diageo North America, Inc. and Diageo Americas Supply, Inc. (collectively "defendants" or

"Diageo"). On June 8, 2012, defendants filed their response in opposition to plaintiffs' motion

(ECF No. 37) and brief in support (ECF No. 51.) Plaintiffs filed a reply brief on June 25, 2012.

(ECF No. 54.) Plaintiffs' complaint (ECF No. 1) and the present motion (both filed the same

day) allege that frozen cocktail products produced by defendants under the PARROT BAY and

SMIRNOFF brand names infringe the design patent and trade dress utilized in frozen cocktail

products produced by plaintiffs under the DAILY'S brand name. Specifically with respect to the

patent infringement claim, plaintiffs allege that the pouches used by Parrot Bay and Smirnoff for their frozen cocktail products (individually the "Parrot Bay pouch" and the "Smirnoff pouch" and collectively the "Diageo pouches") infringe United States Design Patent No. D 571,672 (the "'672 patent"), which is exclusively licensed to ABC by PPi.

Following an expedited discovery period, the court held an evidentiary hearing on August 14, 15, 16, and 22, 2012 during which evidence was admitted and testimony from several witnesses was presented. Testimony was heard from: (1) R. Charles Murray ("Murray") (the inventor of the '672 patent); (2) Timothy Barr ("Barr") (ABC's vice president of marketing and strategy); (3) Ian Lander ("Lander") (senior vice president of client services at directive analytics); (4) Michael Ward ("Ward") (Diageo's senior vice president for innovation in North America); (5) Travis Funk ("Funk") (a scientist for Diageo's innovation team) (6) Dr. Robert Kimmel ("Kimmel") (defendants' technical expert); and (7) Nicholas Mesiti ("Mesiti") (plaintiffs' patent expert). The court ordered the parties to file proposed findings of fact and conclusions of law by September 27, 2012. The matter now being ripe for disposition, the court makes the following findings of fact and conclusions of law.

## II.    <u>FINDINGS OF FACT</u>[1]

### A.    <u>The Parties</u>

#### 1.    *Plaintiffs*

1.    ABC is a Delaware corporation with its principal place of business in Verona, Pennsylvania. (ECF No. 1 ¶ 1.)

---

[1] All references contained herein refer to the exhibit number or letter as identified in the parties' joint hearing exhibit submissions. Because plaintiffs' exhibit binders utilized letters and defendants' exhibit binders used numbers, the court will simply label all exhibits as "Ex." along with the corresponding letter or number. All other references are to either the applicable ECF number, deposition transcript, or hearing transcript.

2.      PPi is a Florida limited liability company with its principal place of business in Sarasota, Florida. (Id. ¶ 2.)

### 2.    *Defendants*

3.      Diageo North America, Inc. is a Connecticut corporation with its principal place of business in Norwalk, Connecticut. (Id. ¶ 3.)

4.      Diageo Americas Supply, Inc. is a New York Corporation with its principal place of business in Norwalk, Connecticut. (Id. ¶ 4.)

### B.    The Daily's Cocktails

### 1.    *Pouch Development and the '672 Patent*

5.      In 2005, ABC sought to develop a ten-ounce, single-serve ready-to-drink ("RTD") frozen cocktail product in a flexible foil pouch to be sold under its Daily's brand name. (Aug. 14 Tr. at 147-48.)

6.      PPi initially provided ABC designs for two different pouches, Exhibits 31 and 32, which were used by ABC for its Daily's frozen cocktails for short periods respectively, in 2005 and 2006. (Id. at 151-52.)

7.      ABC wanted its frozen cocktail products to be packaged in a unique and distinctive flexible pouch. (Id. at 148-49.)

8.      ABC contacted PPi's owner, Murray, to create and develop a pouch for its Daily's frozen cocktail products. (Id. at 50.)

9.      ABC reviewed more than a dozen possible pouch designs over the course of approximately eighteen months in the process of developing its package design. (Id. at 50, 59, 151-52.)

10.     Ultimately, PPi produced a new pouch design for the Daily's pouches, which ABC has used for the Daily's frozen cocktail products since 2007. (Id. at 151.)

11.     Murray's pouch design for ABC is allegedly embodied in the '672 patent. (Id. at 60-61, 67); (Ex. A).

12.     Murray assigned the '672 patent to PPi, which in turn licensed it exclusively to ABC. (Ex. B; Ex. C.)

### 2.     *The Daily's Frozen Cocktail Products' Appearance*

13.     The appearance of the Daily's frozen cocktail products is generally consistent across all the flavors offered by ABC. (Ex. 146 (Frozen Peach Daiquiri); Ex. 147 (Frozen Pina Colada); Ex. 148 (Frozen Margarita); Ex. 149 (Frozen Lemonade); Ex. 150 (Frozen Pomegranate Acai Margarita); Ex. 151 (Frozen Mojito)).

14.     The Daily's frozen cocktail products are sold in pouches which all have a generally hourglass shape when viewed from the front, a wedge shape when viewed from the side, and a lenticular shape when viewed from the bottom. (Id.)

15.     The graphic treatments on the packaging for the Daily's frozen cocktail products include three general areas. (Ex. 151.) The topmost portion contains the words "FREEZE AND ENJOY" on a solid background in a color that generally corresponds to the flavor of the beverage (e.g. green for mojito, red for strawberry, etc.). (Id.) The large central portion contains a black rectangle with the words "DAILY'S READY TO DRINK" in silver at the top. (Id.) Below the black rectangle are the words "ALCOHOL IS IN IT!" printed above and just to the right of the central imagery on the package. (Id.) The central imagery (also in the central portion) is an image of a glass containing a colored liquid, surrounded by garnishes, both of which generally correspond to the flavor of the beverage (e.g., a peach-colored liquid surrounded by peach

4

wedges). (Ex. 146.) The garnishes are depicted swirling around and splashing into the glass

itself. (Id.) The images of the glass and the fruit, as well as the text related to alcohol are all

presented over a background of a "swirl" pattern of two colors: one color is always white, while

the other color is generally dictated by the flavor of the beverage, i.e. green for margarita and

mojito, peach for peach, yellow for pina colada, etc. (Ex. 146; Ex. 147; Ex. 151.) The frozen

lemonade "swirl" pattern is blue and white. (Ex. 149.) The bottommost band, below the central

imagery, contains the name of the beverage, i.e. "Frozen Mojito." (Ex. 151.) Text at the bottom

of the package includes the alcohol content information, the volume of the pouch, and the words

"AMERICA'S PREMIUM BRAND" in white text on a black background (Ex. 146; Ex. 147; Ex.

148; Ex. 149; Ex. 150; Ex. 151.)

### C. The Smirnoff and Parrot Bay Frozen Cocktail Products

#### 1. *Diageo Product Development*

16.     Diageo, the world's largest liquor manufacturer, noticed the rapid expansion of the RTD

frozen pouch market segment as a result of the Daily's frozen cocktail products and sought to

enter the market in approximately December 2010 or January 2011. (Aug. 15 Tr. at 210-13.)

17.     Pursuant to that goal, Diageo initiated "Project Vineyard," which was aimed at producing

a malt-based frozen cocktail product in a flexible pouch under its Parrot Bay brand to compete

with the Daily's frozen cocktail products. (Id. at 202-03.) Diageo also initiated a companion

project, "Project Supersonic," to produce a similar pouch under Diageo's Smirnoff brand name.

(Ex. LLL.) Diageo chose these two brands because customers are familiar with them, even

outside the spirits categories with which they are traditionally associated. (Aug. 15 Tr. at 198-

99.)

18.     Diageo acquired the Parrot Bay trademark in 2002, after it had been in the marketplace for at least five years. Parrot Bay products have yielded Diageo over six hundred million dollars in sales, and Diageo has spent over one hundred million dollars on advertising those products. (Id. at 211-12.)

19.     The Smirnoff brand has been sold in the United States for at least fifty years, and has enjoyed billions of dollars of sales in the last ten years alone. (Id. at 212.)

20.     Diageo sought to enter the RTD frozen cocktail market because it had seen a loss in market share in the overall RTD category, specifically with its Smirnoff Ice line, as a result of the growth of Daily's products in the frozen cocktail segment of the RTD market. (Id. at 213-14.)

21.     In consultation with Wal-Mart, Diageo determined that a malt-based product could be brought to market more quickly than a wine-based product, and could be sold in more and different retailers—specifically, Wal-Mart stores in Tennessee, Kentucky and New York. (Id. at 198, 204-08.)

22.     Diageo had no experience with producing and filling pouches prior to beginning the Vineyard and Supersonic projects, but had worked with other frozen beverages in the past. (Id. at 220.)

23.     Diageo followed an accelerated timetable for creating its frozen cocktail products, designing and launching the products in approximately five months in order to have them in the market by the summer of 2011. (Id. at 218-20.)

24.     To meet its time goal, Diageo accelerated its multi-stage review and approval procedure, known as a gate process. (Aug. 16 Tr. at 75.) The acceleration required doing several activities at the same time, including designing the package and trade dress, locating pack film suppliers,

package filling equipment, developing the beverage fluid, and determining the physical and technical requirements for the pouch. (Aug. 15 Tr. at 218-20.)

25.     Diageo shortened the timeframe for product development by "wargaming" or engaging in "competitive benchmarking" with respect to the Daily's frozen cocktail products. (Id. at 214-17); (Ex. AAA). This process involved examining the Daily's products and determining what contributed to their success. (Id.) It also included reviewing the Daily's packaging while designing the packaging for the Parrot Bay and Smirnoff products, (Aug. 16 Tr. at 43), and approximating the size and shape of the Daily's pouch. (Aug. 16 Tr. at 163-64); (Ex. BBBB, FFFF, HHHH, NNNN).

26.     Diageo sought to approximate the size and shape of the Daily's pouch because it is common practice in the beverage industry to use the same or similar serving format and size as competing products so that consumers do not believe that they are getting less value from the competition. (Aug. 16 Tr. at 149.) In an effort to capture the "value . . . perception" in the "overall pack appearance" of the Daily's products, Diageo relied heavily upon the Daily's pouch. (Aug. 15 Tr. at 216.) Diageo employee Rob Warren posed this question to a fellow employee: "Mike: What merchandising creativity can we steal from Daily's?" (Ex. HHH.) Another Diageo employee, Stephen Chandler, sought to order prototype pouches from the manufacturer PTIS and confirmed in correspondence that he did not care what the prototypes looked like, but merely stated "Copy Daily's." (Ex. HHHH.) Ultimately Diageo sought a pouch size that would "match Daily's," and be the same width and height of the Daily's pouch, and would have a "'hole' at top the same as on Daily's." (Aug. 14 Tr. at 104); (Ex. BBBB, FFFF.)

27.     Diageo employee Katie Raath ("Raath") was asked to produce an initial sketch of a possible pouch design for the Parrot Bay frozen cocktail product. (Ex. 132.) The initial pouch

design was based upon a pouch die line[2] produced by the company Liquid Manufacturing (Aug. 16 Tr. at 95; Ex. 134), which Raath modified to include a cutout in the upper right-hand corner shaped like a parrot's wing. See (Ex. 133.)

28.     Funk sent Raath's sketch to Matthews Graphics Corporation for engineering guidelines and drawings. (Aug. 16 Tr. at 87.) Matthews returned a proposed die line, (Ex. 136), which Funk altered. (Ex. 137; Aug. 16 Tr. at 97-100.) Finally, Matthews returned a new die line reflecting Funk's changes; specifically, the waist on the right-hand side of the pouch was moved up, and the location of the tear notches was changed. (Ex. 139); (Aug. 16 Tr. at 101-02).

29.     Despite the effort put into the die line, the Diageo engineering team had concerns that the wing cutout could cause inadvertent tearing—it could become essentially a pull-tab for the tear-off portion of the pouch—or it could catch in the filling machines. (Aug. 16 Tr. at 102-03.) In order to save time and get the product into production, Diageo ultimately scrapped the wing cutout and approved the pouch shape and die line as set forth in Exhibit 140—specifically, a pouch shape that is symmetrical from left to right. (Aug. 16 Tr. at 103-06.) Funk approved the die line for the Parrot Bay pouch on February 25, 2011. (Id. at 105, 122.)

30.     In February 2011, Funk expressed concern that "legal challenges on the die line" posed a risk for the Parrot Bay project, stating that the initial review was conducted, but "was not definitive." (Ex. PPPP.) Funk acknowledged that waiting for legal approval would result in delays to the project and that the cost of the die itself was at risk if the die line was not approved by the legal department. (Id.) Ultimately, Diageo concluded that a die line similar to that used for the Daily's pouch would "be okay in the short term." (Aug. 16 Tr. at 163-64); (Ex. NNNN). Following approval of the die line in February 2011, Diageo employees continued to use a

---

[2] Die lines are the measurements for the dies that actually cut the pouch from the film. They dictate the pouch's shape as it is cut from the surrounding film. (Aug. 14 Tr. at 29.)

photograph of a marked-up Daily's pouch in correspondence related to the Parrot Bay product. (Ex. L); (Aug. 14 Tr. at 71-72).

31.  Angela Campisi ("Campisi") (Diageo's Engineering Asset Strategy Director) met with Murray at the PPi offices on May 4, 2011, at which time she was specifically informed about the existence of the '672 patent. (Aug. 14 Tr. at 73.) Murray presented Diageo with four potential alternative pouch designs to consider at that time. (Id. at 73-74.)

32.  After the May 4, 2011 meeting, Kevin Scherry (Diageo's Global Category Specialist for Flavors and Grain Neutral Spirits) ("Scherry") received an email from Murray, in which Scherry was informed that the Daily's pouch is patented. (Id. at 75-76.) In response, Scherry asked Murray what the patents were "around," believing that Diageo "may need to avoid certain design attributes." (Id. at 76; Scherry Dep. at 118-120; Ex. G.)

33.  During the development process, Diageo used a Daily's frozen cocktail product as a stand-in for the Parrot Bay product while conducting product testing, a procedure that Funk admitted was "bad behavior." (Aug. 16 Tr. at 142-46); (Ex. YYY).

**2.    *The Parrot Bay and Smirnoff Frozen Cocktail Products' Appearance***

34.  The graphics on the Parrot Bay frozen cocktail products are based upon the Parrot Bay rum bottle graphics (Ex. 104) and the Myers's frozen cocktail shaker graphics (a separate Diageo rum brand). (Ex. 100); (Aug. 15 Tr. at 199).

35.  The Parrot Bay and Smirnoff frozen cocktail products are sold in pouches which all have the same general shape, including an hourglass shape when viewed from the front, a wedge shape when viewed from the side, and a lenticular shape when viewed from the bottom.

36.  The packaging for the Parrot Bay and Smirnoff frozen cocktail products prominently features an image of a glass surrounded by fruit to depict the product, provide a serving

suggestion, and indicate the flavor and potential garnishes for the product. (Aug. 15 Tr. at 231-32); (Ex. 23, 97.) The colored bands at the top and bottom of the Diageo packages generally reflect the flavor of the product itself. (Aug. 15 Tr. at 232.) The top band contains the words "FREEZE & SQUEEZE," while the bottom band contains the word "FROZEN," the flavor of the beverage, and other product information including the alcohol content and a notice that the beverage is malt-based and contains added flavorings and colorings. (Ex. 23, 97.) Both the Parrot Bay and Smirnoff packages have a centrally-located notice that states "BEVERAGE ALCOHOL DO NOT SELL TO CONSUMERS UNDER 21." (Id.) The notice on the Parrot Bay packages is crafted to look like a postal cancellation stamp, (Ex. 97.)

37.    Just above the image of the glass on the Smirnoff packages is the Smirnoff name and "double eagle" mark. (Ex. 23.) Each Smirnoff package incorporates a silver background with rays extending out from the Smirnoff mark, intended to convey a "more vibrant, high energy . . . type of offer." (Aug. 15 Tr. at 229-30); (Ex. 23).

   **D.    Design Patent Infringement**

   **1.    *Claim Construction***

38.    The '672 patent claims an ornamental design for a flexible liquid-containing pouch, as shown in Figures 1-8 of Exhibit A.



*From left to right, FIG. 1, FIG. 2, FIG. 3, and FIG. 4 from the '672 patent*[3]

## 2.    *Defendants' Validity Challenges*

### a.      **Functionality**

39.     The design claimed in the '672 patent was one of at least a dozen proposed designs that resulted in the design for the Daily's pouch. (Aug. 14 Tr. at 58-59.)

40.     The curved sides claimed in the '672 patent are one of many ways of achieving a generally hourglass shape in a flexible pouch, as can be seen by reviewing other design patents in evidence. (Ex. OOOOO (U.S. Design Patent No. 410,838); Ex. VVVVV 20 (U.S. Design Patent No. 435,440); Ex.VVVVV 24 (U.S. Design Patent No. 502,092); Ex. 40 (U.S. Design Patent No. 434,976)). Other design patents for flexible pouches do not claim curved sides or an hourglass shape. (Ex. 44.) Murray and Kimmel both testified that there are many alternatives for the shapes of the sides of a flexible pouch. (Aug. 14 Tr. at 63); (Aug. 22 Tr. at 33.) The ARBOR MIST frozen wine cocktail pouch does not have curved sides. (Ex. 87.) The SEAGRAM'S ESCAPES frozen sangria pouch has sides that continuously curve from top to bottom, as opposed to having a discrete curved portion of the side. (Ex. 143.)

41.     The curved sides of the flexible pouch embodying the '672 patent make the pouch more difficult to produce and manufacture, thus making it more expensive. (Aug. 14 Tr. at 146-47.) The curved sides, therefore, are not necessary and their shape is ornamental and not purely dictated by function.

42.     The portion of the pouch above the side curvatures in the design claimed in the '672 patent is one of many possible choices for the top of a flexible pouch, as can be seen in Exhibit

---

[3] Although there are eight figures set forth in the '672 patent, plaintiffs only claim that defendants infringe the first embodiment, which is set forth in Figures 1-4. The second embodiment is set forth in Figures 5-8. Defendants do not address the issue of whether the two embodiments involve a single inventive concept.

92, wherein that portion of the pouch curves inward, (Ex. 92), or the top can resemble the top of

a cocktail shaker, as shown by the Arbor Mist pouch. (Ex. 87.)

43.     The triangle-shaped notches, or "tear notches" indicated on both sides near the top of the

pouch depicted in Figure 1 of the '672 patent are one of several ways of removing the flat

portion at the top of the pouch and can be placed in multiple locations, or not included at all.

(Aug. 14 Tr. at 64, 104.) Murray testified that other shapes can be used for the tear notches. (Id.

at 104.) The Seagram's Escapes pouch, Exhibit 143, only has one tear notch, as does the design

embodied in Exhibit 43. Testimony indicated that there are other, cheaper ways of removing the

top of a pouch, including a simple tear in the packaging. (Aug. 14 Tr. at 104.)

44.     The hole at the top of the pouch in Figure 1 of the '672 patent (often called a "sombrero

hole") is one of several ways available to hang a flexible pouch. Both the Seagram's Escapes

(Ex. 143) and the Arbor Mist (Ex. 87) pouches employ circular holes of two different sizes.

Murray testified that such an opening "can be a circle; it can have two 70-degree cuts; it can be a

larger sombrero; it can be an oval; many shapes." (Aug. 14 Tr. at 64.)

45.     The double lines on the outside edge of the pouch design claimed in Figure 1 of the '672

patent are "seal lines." Seal lines can be of varying widths, thereby achieving different

ornamental results. (Id. at 65.)

46.     The two circles at the bottom of the pouch in Figure 1 of the '672 patent are known as

"cooling holes," which are an unsealed area that allows for a higher pressure to be applied when

affixing the gusset to the bottom of a pouch. (Ex. 46.) Murray "chose those smaller round holes

to fit into the design" of the '672 patent. (Aug. 14 Tr. at 135.) As evidenced in Exhibit 46, there

can be more of these holes (the image in Figure 1 of Exhibit 46 contains six holes), and they can

be of varying shapes and sizes (the image in Figure 1 of Exhibit 46 contains circular and oval

holes). Murray testified that the holes can be triangular, as well. (Aug. 14 Tr. at 103.) The holes

are visible in the commercial embodiment of the '672 patent, i.e. the Daily's pouch. See e.g. (Ex.

149.)  Although the cooling holes do assist in the manufacturing process, the number, size, and

shape can be varied as part of the ornamental design of a pouch.

47.     The semicircular shapes between the seal lines near the base of the pouch in Figure 1 of

the '672 patent reflect cutouts in the gusset panel that allow the two sides of the pouch to seal

together. These are referred to as "seal holes" and Kimmel agreed that "these patterns and shapes

[are] interchangeable." (Aug. 22 Tr. at 21.)

48.     The rounded shape that occupies the center of the base of the pouch in Figure 1 of the

'672 patent is known as a "gusset seal." Gusset seals can be of varying heights and shapes, as

indicated in Exhibit 5 (the Daily's "Party in a Pouch"), which has a hexagonal seal. (Ex. 5.)

49.     The base of the pouch, or "gusset," as depicted in Figure 4 of the '672 patent, can be of

varying shapes and sizes. (Aug. 14 Tr. at 121-22.) Changing the size and shape of the curve

changes the overall visual impression of the pouch. (Id.); (Aug. 16 Tr. at 203); (Aug. 22 Tr. at

65). Although the base of most stand-up flexible pouches (known as "Doyen-style" pouches)

have a generally lenticular shape, as shown in Figure 4 of the '672 patent, the shape of the base

can vary based upon the design. (Ex. 5, 92, 93, 94.)

50.     Likewise, the side perspective of the '672 patent as shown in Figure 2  is characteristic of

Doyen-style pouches in that it is generally wider at the bottom than at the top; however, other

design patents entered into evidence reveal that the shape of those sides also can vary. (Ex. 92,

93, 94.)

51.     Other testimony and documentary evidence indicates that the curved sides of the pouch offer an "ergonomic" shape that makes the pouch comfortable for the user to hold.[4] Defendants indicate that the "waist" in the pouch allows the consumer to manipulate the product; and it acts as a dam to hold the slush in place. (Aug. 16 Tr. at 112.) Finally, defendants note other allegedly functional aspects of the hourglass shape, including helping the filling process. (Id. at 113.)

### b.     35 U.S.C. § 112 Indefiniteness

52.     The design claimed in the '672 patent shows one pouch design and two embodiments of that design. (Aug. 16 Tr. at 200.) Figures 1 through 4 illustrate the first embodiment and Figures 5 through 8 illustrate the second. (Id.)

53.     The design claimed in the figures of the '672 patent passed without objection by the patent examiner, as evidenced by the issuance of a design patent with respect to the application embodying that design. (Ex. 7.)

54.     Figures 1 and 5 of the '672 patent illustrate the front elevational views of the claimed design; Figures 2 and 6 illustrate the side elevational views of the same; Figures 3 and 7 illustrate the rear elevational views of the same; and Figures 4 and 8 illustrate the bottom elevational views of the same. (Ex. A); (Aug. 16 Tr. at 200-01). The patent claims that each view is of the same pouch. (Ex. A.)

55.     Testimony at the hearing indicated that the pouch illustrated by the figures of the '672 patent is filled. (Aug. 16 Tr. at 201). If the pouch illustrated in the '672 patent was not filled, the gusset would not expand, and the pouch would be essentially flat, thus rendering Figures 2, 4, 6, and 8 inconsistent. (Id.)

---

[4] Defendants reference United States Patent Application Serial No. 11/683,133 (Kelly Decl. (ECF No. 41) Ex. R); United States Patent Application Serial No. 11/551,071 (Id. Ex. S); and United States Patent Application Serial No. 12/233,631 (Id. Ex. T).

56.     Murray testified that the pouch illustrated in the '672 patent is an open pouch, unsealed at the top. (Aug. 14 Tr. at 99.) Murray could not specifically articulate what the line[5] just above the sombrero hole was. (Id.) He did confirm that such a line is not the bottom edge of the top seal of the pouch. (Id. at 100.) Murray's application for a utility patent for a flexible pouch similar to the pouch claimed in the '672 patent identifies line 2a as a "closing seal," but does not specify whether the line corresponds to the top or bottom of the seal, or whether such a line is present in an unsealed pouch. (Kelly Dec. (ECF No. 43) Ex. Q.)

57.     A review of the commercial embodiment of the '672 patent—the Daily's pouch, reveals that such a line is present, and that it is not the bottom edge of a top seal. (Ex. 148.) It is unclear whether such a line is present on an unsealed pouch.

58.     If line 2a were construed as a seal line, the pouch would not function, since liquid could freely flow out through the sombrero hole. (Ex. A.) Moreover, a wider seal can be placed at the top of the pouch, based upon customer specifications, as confirmed by defendants' own packaging expert. (Aug. 16 Tr. at 197); (Murray Dep. 138-39, 141). The court concludes that line 2a in Figure 1 represents a line on a filled, unsealed pouch, prior to the top seal being applied. (Aug. 14 Tr. at 82.)[6] This construction is consistent with the shape of the pouch claimed in Figure 2, which does not include a straight line at the very top (which would be present if a top seal had been applied). (Ex. A.)

---

[5] The line is identified as "2a" in Figure 1 of Exhibit 3.
[6] Defendants point to several other drawings, including Murray's utility patent application (Kelly Decl. Ex. Q) and an internal PPi document (Ex. E), in support of their argument that the figures in the '672 patent are inconsistent. Defendants' argument, however, asks the court to consider evidence outside the figures of the '672 patent when assessing the consistency of the figures in the '672 patent. This argument carries little weight insofar as the court must determine only if the figures of the '672 patent, considered along with the specification, are consistent and therefore patentable. See MPEP § 1504.04(I).

59.     The tear notches in Figures 1, 3, 5, and 7 are illustrated with a closed outside edge. (Ex. A.) Testimony at the hearing revealed that these notches should be illustrated as "open Vs" that would allow a user to tear off the top portion of the pouch. (Aug. 22 Tr. at 19.)

c.     **Defendants' Section 102 Anticipation Claims and Section 103 Obviousness Claims**

60.     The design claimed in the '672 patent is an ornamental design for a flexible Doyen-style pouch. Doyen-style pouches were first invented in 1963 by the Doyen brothers, who obtained United States Patent No. 3,380,646. (Aug. 16 Tr. at 192-96); (Ex. 10). Subsequently, many ornamental designs have been applied to Doyen-style pouches, and those designs have received design patent protection. (Ex. A, 40, 43, 92, 93, 94.) Testimony from Murray indicates that the design claimed in the '672 patent is unique and that at the time of its invention, there was nothing else like it in the world. (Aug. 14 Tr. at 52, 84, 122.)

61.     Defendants' expert on packaging suggests that several hourglass-shaped pouches (when viewed from the front) with lenticular bases (when viewed from below) and triangular or wedge shapes (when viewed from the side) existed prior to the issuance of the '672 patent. (Aug. 16 Tr. at 197-98); (Aug. 22 Tr. at 8-10). Defendants cite numerous pieces of prior art that they claim show that the '672 patent was anticipated and, therefore, lacks novelty.



*Ex. 92, from left to right, FIG. 3, FIG. 6, and FIG. 2*

62.     Exhibit 92, pictured above, is the design claimed in United States Design Patent No.

392,559.[7] Exhibit 92 discloses a flexible pouch with sides that continuously curve in and out

from the center of the pouch, and are never vertical or parallel to one another. The design

discloses no sombrero hole, gusset curve, tear notches, cooling holes, sealing holes, and has a top

seal that appears to be taller than the seals on the sides.



*Ex. 40, from left to right, FIG. 4, FIG. 3, and FIG. 5*

63.     Exhibit 40, pictured above, is the design claimed in United States Design Patent No.

434,976. Exhibit 40 discloses a flexible pouch with an hourglass shape and straight sides above

---

[7] Plaintiffs note that the patent examiner searched the class and sub-class containing the patent in Exhibit 92. The patent examiner did not find this patent to be relevant enough to warrant citation. (Aug. 22 Tr. at 98.)

and below the waist of the pouch. The corners both above and below the waist are sharp, and the sides above and below the waist are approximately the same length. The design claimed in Exhibit 40 discloses no sombrero hole, no cooling holes, no sealing holes, and no tear notches. When viewed from the side, the front and back portions of the pouch remain parallel to each other as they extend from the bottom of the pouch, before making a rounded curve inward toward the top of the pouch. When viewed from below, the base of Exhibit 40 forms a narrow oval shape with fins extending from each side.



*Exhibit 43, from left to right, FIG.3, FIG. 8, and FIG. 4*

64.    The design in Exhibit 43,[8] pictured above, is the design disclosed in United States Patent No. 6,912,825. Exhibit 43 has sharply pronounced side curvatures and sharp corners at the base. Exhibit 43 does not disclose a sombrero hole or cooling holes, but does disclose a single, large tear notch on the left-hand side. When viewed from the side, the front and back portions of Exhibit 43 remain parallel to each other from the bottom to almost the top, where they sharply curve inward toward the top.

65.    All the prior art pouches relied upon by defendants include a straight line extending from the top of the pouch when viewed from the side. This line is meant to illustrate the top seal on the pouch. The front and back walls of the pouches, however, curve differently from the bottom

---

[8] Kimmel testified that there are differences between the patent in Exhibit 43 and the '672 patent. (Aug. 22 Tr. at 30.)

to the top of the pouch. (Ex. 40, 92, 93, 94.) While all the prior art pouches relied upon by

defendants share a generally lenticular-shaped base, the ovals and circles formed by those bases

can be continuously curving (Ex. 94), can have straight sides (Ex. 92), or can resemble a narrow

oval. (Ex. 40.)

66.     Defendants also contend that the design claimed in the '672 patent is embodied in the

Daily's Party in a Pouch (the "Party Pouch"). (Ex. 5.) The Party Pouch was in use as early as

2004, which makes it prior art to the '672 patent. (Aug. 15 Tr. at 42.) Testimony indicated that

the Party Pouch was produced by Saddlesprings for ABC. (Id. at 50.)

  

67.     The design pictured above is the Party Pouch. As with Exhibit 40, discussed above, the

corners both above and below the curved sides on the Party Pouch are sharp and not rounded.

The Party Pouch does not have a sombrero hole, and instead has a zipper top, which allows the

pouch to be resealed after the top has been removed. The base of the pouch has a distinctly

hexagonal appearance, due to the use of a hexagonal gusset piece. The resulting gusset curve is

not rounded, but instead looks like one-half of a hexagon when viewed from the front. The tear

notches on the Party Pouch are quite close to the top edge of the pouch, and are correspondingly

quite far from the top of the curved sides. When viewed from the side, the bottom half of the

Party Pouch is quite bulbous, above which point the sides narrow quickly, with approximately the top one-quarter to one-half of the package appearing as essentially a straight line.

68.    Defendants also contend that Exhibits 31 and 32 are prior art to the '672 patent, insofar as Exhibit 31 was in use in 2005 and Exhibit 32 was in use in 2006 by Daily's. (Aug. 15 Tr. at 29.) Exhibits 31 (left) and 32 (right) are pictured below.



69.    As described by Murray, Exhibits 31 and 32 both have a "radius top," in which the sides above the waist on the pouch are not straight, but instead are constantly curving. (Murray Dep. at 62.) As a result, Murray indicated that they are "totally different" from the Daily's pouch in issue (the commercial embodiment of the '672 patent). (Aug. 14 Tr. at 60.) Neither pouch pictured above has a sombrero hole. (Ex. 31, 32.) With respect to Exhibit 31, the gusset is hexagonal in shape, as discussed previously with respect to the Party Pouch, thus giving the base more of a hexagonal shape.

70.    With respect to obviousness, Kimmel opined that the design of the pouch pictured in Exhibit 43 could serve as a primary reference for the design claimed in the '672 patent, even though Kimmel acknowledged that there are differences between the two. (Aug. 22 Tr. at 30.) Kimmel also opined that one skilled in the art would understand that the bottom curves on the pouch claimed in Exhibit 92 could be substituted for the top curves on the pouch embodied in

Exhibit 43, thus creating a piece of hypothetical prior art that he opines is similar to the '672

patent. (<u>Id.</u> at 30-35.) Kimmel previously testified, however, that the curves on the sides of the

'672 patent were purely functional, and opined that if all functional features of the '672 patent

were removed, all that would remain is a "rectangle with rounded corners." (<u>Id.</u> at 61.)

### 3.    *Plaintiffs' Infringement Claims*

71.    A comparison between the design claimed in the '672 patent (shown in the middle picture

below), the relevant prior art (as embodied in the Party Pouch and shown in the picture on the

left below), and the allegedly infringing Parrot Bay pouch (shown in the picture on the right

below) reveals the similarities between the design claimed in the '672 patent and the Parrot Bay

pouch.

  

72.    The Parrot Bay pouch and the design claimed in the '672 patent share many features in

common. The sides both above and below the waist on the pouches are straight, with the sides

below the waist being substantially longer than those above the waist. The corners above the

waist are both generally smooth rather than sharp, while the corners below the waist of the

design claimed in the '672 patent are slightly more pronounced than on the Parrot Bay pouch.

The curvature of the waist on both the Parrot Bay pouch and the design claimed in the '672

patent are approximately the same depth, although the rate of curvature is slightly different. Both

share a sombrero hole that is the same size and proportion, and the tear notches on both are in the same location. Both have a large rectangular space above the waist in the pouch (regardless where the seal is placed, the space is the same on both pouches). The bottom corners of both pouches are nearly identical as well. The top corners of the Parrot Bay pouch are slightly sharper, but they are still rounded, much like those of the design claimed in the '672 patent. A closer inspection reveals that, despite the printing on the Parrot Bay pouch, the seal holes and the cooling holes are both visible, as is the curvature of the gusset seal.

73.     Based upon the above comparison, the Parrot Bay pouch appears more like the design claimed in the '672 patent than the Party Pouch. The most pronounced difference between the Party Pouch and the Parrot Bay pouch is the square bottom, which results in the sides below the waist appearing to angle inward, while the same sides on the Parrot Bay pouch remain parallel from the waist down. The curvature on the sides of the pouches also differ. The curve on the Party Pouch is a discrete cutout with sharp corners, whereas there is more of a gentle curve on the Parrot Bay pouch. Additionally, the Party Pouch does not have a sombrero hole; rather it has a zipper.

74.     Comparing the bases of the three designs also indicates the similarities between the Parrot Bay pouch and the design claimed in the '672 patent.



75.     As can be seen in the photographs above, the curvature of the lenticular base in both the design claimed in the '672 patent (shown in the middle) and the Parrot Bay pouch (shown on the right) is the same. The fins protruding from either side are also fairly similar. The fin on the right in the photograph of the Parrot Bay pouch appears to be slightly wider, but that appears to be a

result of the flexibility of the packaging rather than a difference between the two designs. As indicated above, the base of the Party Pouch (shown on the left) differs greatly from both the design claimed in the '672 patent and the Parrot Bay pouch, as it has a generally hexagonal shape, due to the hexagonal shape (as opposed to circular shape) of the gusset.

  

76.     With respect to the side views shown above, the Parrot Bay pouch (shown on the right) and the design claimed in the '672 patent (shown in the middle) more closely resemble each other than the Party Pouch (shown on the left). The front and back of the design claimed in the '672 patent and the Parrot Bay pouch are both relatively straight, and both gradually angle toward the top. The Parrot Bay pouch does have a straight line protruding from the top of the pouch that is not portrayed in the design claimed in the '672 patent, but it only extends a short distance from the top of the otherwise wedge shape of the side. The Party Pouch, on the other hand, has a large straight portion at the top, along with a very bulbous base. As discussed previously the Smirnoff pouch and the Parrot Bay pouch are the same and any facts applicable to the Parrot Bay pouch are applicable to the Smirnoff pouch.

     **E.**     **Trade Dress Infringement and Unfair Competition**

          **1.**     ***ABC's Claimed Trade Dress***

77.     ABC set forth the following list of elements that it claims allegedly comprise its trade

dress:

> In addition to its hourglass shape, ABC's trade dress includes three
> horizontal labeling partitions, with the top-most portion consisting of a perforated
> tear-away flap with the language "FREEZE AND ENJOY," the middle portion
> containing the Daily's brand name, a colorful depiction of the particular frozen
> cocktail flavor and corresponding fruit imagery, and the bottom portion
> identifying the specific product and key information thereof.

(ECF No. 9 at 17-18.) This construction of ABC's trade dress was corroborated by Barr in

testimony at the preliminary injunction hearing. (Aug. 14 Tr. at 231-32.)

78.     The specific details of the pouch packaging design and layout are set forth above at

Findings of Fact 13-15 and 34-37.

79.     This claimed trade dress is embodied with only minor differences in the packaging of all

the Daily's frozen cocktail products, which come in several flavors, including Frozen Peach

Daiquiri (Ex. 146); Frozen Pina Colada (Ex. 147); Frozen Margarita (Ex. 148); Frozen

Lemonade (Ex. 149); Frozen Pomegranate Acai Margarita (Ex. 150); and Frozen Mojito (Ex.

151).

### 2.     *Consistent Overall Look*

80.     ABC began utilizing a similar version of its trade dress beginning with the launch of the

Daily's frozen cocktail products in 2005. (Aug. 14 Tr. at 151-52.) The two pouches used

between 2005 and 2007 were slightly smaller, but were still hourglass-shaped, with text, layout

and imagery identical to the present iteration of the Daily's frozen cocktail product. (Ex. 31, 32.)

### 3.     *Inherently Distinctive/Secondary Meaning*

81.     Prior to the launch of the Daily's frozen cocktail products, the market for single-serve,

RTD frozen cocktail products in a flexible pouch did not exist. ABC created this market

segment, and remained the only producer of such products for several years. (Aug. 14 Tr. at 171; Aug. 15 Tr. at 28, 77; Aug. 16 Tr. at 62-64; Ex. LLL.)

82.     From 2005 until the summer of 2011 (when defendants' frozen cocktail products were launched), ABC possessed 99% of the market share for the single-serve, RTD frozen cocktail segment. (Barr Dec. (ECF No. 24-1) ¶ 27); (Aug. 14 Tr. at 189, 215). There were essentially no other significant competitors in that category at the time the Daily's frozen cocktail products launched; therefore, ABC launched the category. (Aug. 15 Tr. at 28, 64); (Aug. 16 Tr. at 64); (Ex. LLL).

83.     Since the launch of the Daily's frozen cocktail products, the sales of those products have been exponential, doubling and tripling every year they have been on the market. (Barr Dec. (ECF No. 24-1) ¶¶ 24-25). Prior to 2011, ABC sold approximately 33,031,392 units, with sales totaling $29,439,917. (Id.)

84.     The Daily's frozen cocktail products have been sold throughout the United States, in grocery stores, liquor stores, drug stores and other large mass merchandisers, including Wal-Mart (which is the largest retailer for those products and has marketed them nationwide). (Aug. 14 Tr. at 172, 191.)

85.     Since the launch of the Daily's frozen cocktail products, ABC has consistently invested in the advertising for those products. (Aug. 14 Tr. at 153.)

86.     ABC has spent a significant amount of money on advertising—between $8 and $10 million since 2007. (Aug. 14 Tr. at 161.) This represents a "considerable portion of ABC's advertising budget." (Barr Decl. (ECF No. 24-1 ¶ 20).)[9] Although ABC did not provide a breakdown with respect to how much was spent per year for advertising, Barr's testimony and

_____

[9] Barr's declaration contains a slightly lower amount with respect to the total amount of advertising dollars spent, as it indicates that "by the end of 2012, ABC's total consumer media advertising expenditures since the launch of its Daily's Cocktails will total over $7 million." (Barr Decl. (ECF No. 24-1 ¶ 22).)

declaration indicate that ABC spent, on average, more than $215,000 per year between 2005 and 2011. (Id.); (Aug. 15 Tr. at 28.)

87.     The advertising prominently features the Daily's frozen cocktail products, including the trade dress. (Aug. 14 Tr. at 162) (Ex. JJ-1, JJ-2, JJ-3 JJ-4, JJ-5, JJ-6, JJ-7, JJ-8). The advertising for the Daily's frozen cocktail products was spread across a wide variety of publications, including trade publications such as "Bev Media," and "Bev Spec," as well as consumer publications, such as Cosmopolitan, Vogue, Shape, InStyle, Glamour, and Woman's Day. (Ex. GG); (Aug. 15 Tr. at 37-38.)  Testimony indicated that at least by 2010, ABC was advertising the Daily's frozen cocktail products on a national scale. (Aug. 15 Tr. at 37-38.) ABC also uses social media as a way of reaching customers, particularly customers in their twenties, who frequently use social media and the Internet to interact with the company. (Aug. 14 Tr. at 162.)

88.     According to Murray, many other companies have approached PPi and asked to use the Daily's pouch shape, and have been unable to do so. (Id. at 52.)

89.     With respect to copying, the court has made certain findings indicating that Diageo sought to copy the size and shape of the Daily's pouch. See Findings of Fact 16-33. Diageo referred to the Daily's frozen cocktail products as part of the process of designing the artwork for the Parrot Bay frozen cocktail products. (Aug. 16 Tr. at 42-43); (Ex. CCC).

### 4.     *Likelihood of Confusion*

90.     ABC's and defendants' frozen cocktail products both cost the consumer less than two dollars per pouch, or approximately $1.97 to $1.99. (Aug. 14 Tr. at 172, 191.) This price point offers what Barr referred to as a "low barrier to purchase," while still having an "enormous amount of appetite appeal." (Id. at 186.)

91.     Because of the price, the products are "impulse purchases," meaning that customers do not generally go into a retail establishment specifically to buy them. (Id.) As an impulse purchase, customers are primarily motivated by the product's price and location in the store. (Id. at 186, 192.) Barr emphasized that consumers "just buy[] it based on price. Price is a major component." (Id. at 187.) The products are often displayed prominently at the ends of store aisles, in large bins, and in freezers. When purchased frozen, they may be quickly consumed. (Id. at 172, 186); (Ex. Q, R, S, T, U). ABC's and Diageo's frozen cocktail products are often sold hanging from the same rack, or intermixed in the same freezer cases. (Id. at 173-75); (Ex. Q, R, S, T, U).

92.     Barr's testimony at the hearing indicated that customers rarely exercise much care when selecting impulse purchases, and do not rely on brand loyalty when making their purchase decisions. (Aug. 14 Tr. at 186-87.)

93.     To the extent that defendants emphasize the importance of brand loyalty and strength of branding in the alcoholic beverage industry, see generally ECF No. 96 at 81-88, they rely upon documents prepared by ABC in anticipation of trying to enter into an entirely new market, one in which they had never competed. (Ex. 63); (Aug. 15 Tr. at 45-46). Defendants point to Ward's testimony, which indicates that companies invest millions of dollars to build brand awareness, thus keeping their brands in customers' heads when entering a retail establishment. (Aug. 15 Tr. at 245.) Ward indicated that "I certainly look at the marketing money invested . . . to be indicative that they **certainly think** that brands are important." (Id.) (emphasis added).

94.     ABC presented several voicemail messages that purportedly indicate that consumers were confused with respect to the source of the products they had purchased. The first voicemail asked why the mango daiquiri product does not contain an ingredients listing; however, ABC does not

make a Daily's mango flavor (although Diageo does), and the Daily's frozen cocktail products display an ingredients list (but Diageo's products do not). (Aug. 14 Tr. at 203-04); (Ex. Y). A second voicemail requested a donation of "pirate bay" "ready-made frozen drink packets" from Daily's.[10] (Id.); (Ex. X).

95.     The Daily's Facebook page contains other evidence of customer confusion with respect to the source of some frozen cocktail products. Several individuals posted references to a mango-flavored Daily's product which, as indicated above, ABC does not produce. (Aug. 14 Tr. at 205-07); (Ex. CC).

96.     Another consumer, who registered to receive email updates about Daily's frozen cocktail products, indicated that her favorite Daily's product was "the MANGO DAIQUIRI POUCH MIX." (Aug. 14 Tr. at 201-02); (Ex. AA).

97.     In a posting on the Parrot Bay Facebook page, another consumer noted that "peach is even better," although Parrot Bay does not produce a peach flavor. (Ex. DD.)

98.     Kimmel was asked during the hearing to "[u]se the Parrot Bay pouch to demonstrate" a particular aspect of the product. There were several frozen cocktail products in front of him, and he picked up the Daily's product instead. (Aug. 16 Tr. at 194, 211.)[11]

99.     The Daily's frozen cocktail products and the Parrot Bay and Smirnoff frozen cocktail products are both marketed to essentially the same consumers. (Aug. 14 Tr. at 192, 193.)

---

[10] As defendants note, this instance does not relate to an actual consumer of the products; rather, it is a solicitation for a charitable donation and, therefore, is entitled to less weight.

[11] ABC also relies on the results from a consumer confusion survey conducted by Ian Lander ("Lander") of Directive Analytics to support their contention of actual confusion. As the court indicated on the record at the hearing conducted on August 9, 2012, the court finds that the Lander survey is unreliable and, therefore, is to be accorded little weight.

100.    Malt-based products (like Diageo's) are brought to market through beer distributers, as opposed to wine-based products (like ABC's), which are brought to market through spirits and wine distributers. (Aug. 15 Tr. at 207.)

101.    Due to differences in alcohol retail laws, there are some differences in the kinds of retailers that can sell malt-based beverages as opposed to wine-based beverages. (Ward Decl. (ECF No. 48) ¶ 14).

###    F.    **Irreparable Harm**

####        1.    *Plaintiffs' Alleged Delay*

102.    ABC first became aware of defendants' Parrot Bay frozen cocktail products on June 30, 2011, and of the Smirnoff products in May 2012. (Ex. 153 at 4.) Barr testified that as soon as he became aware of the Parrot Bay products, ABC "went immediately to the patent holder." (Aug. 14 Tr. at 225.) ABC was concerned about the Diageo products after hearing about their launch. (Id. at 188.)

103.    Barr indicated that ABC received examples of the Parrot Bay frozen cocktail products "several weeks later," possibly at the beginning of August 2011. (Id. at 198.) Seeing the Parrot Bay frozen cocktail products caused ABC concern, because "the shape was identical to what [ABC was] selling." (Id. at 199.) ABC received market information about the distribution of the Parrot Bay frozen cocktail products in mid-September 2011. (Id. at 198-99.) An ABC representative attending a trade show in October 2011 apparently learned that Diageo was voluntarily pulling the Parrot Bay pouch off the market; however, "shortly thereafter," ABC learned that this was not the case. (Id. at 199-201.)

104.    On October 16, 2011, Murray sent an email to Scherry, seeking to "discuss the copy of the Daily's pouch" and informing him that the "design and trademark and dress are all

protected." (Ex. 83.) Murray received a response from Evan Gourvitz, Diageo senior counsel, asking Murray to contact him. (Id.)

105.    On December 8, 2011, counsel for PPi sent Diageo a cease and desist letter alleging that the Parrot Bay pouch infringed the '672 patent, noting as well that "not only has Diageo copied the shape of the pouch but has also copied aspects of the Daily's branding. (Aug. 14 Tr. at 112-14); (Ex. 54). Counsel for Diageo responded by letter dated January 18, 2012, denying the infringement allegations. (Ex. J.) Counsel exchanged other letters between January 2012 and March 2012 in which Diageo denied the infringement allegations. (Id.)

106.    In an email exchange between Murray and Bill Lanham ("Lanham"), Murray agreed with Lanham's proposal to wait and see if sales of the Parrot Bay products would "take off," preferring to see if "there is potential big dollars involved then the settlement potential is bigger and it would be easier to negotiate." (Ex. 53.) Murray responded "[t]hanks and good comments and that is why I am doing very little at this time." (Id.) This email confirms Murray's earlier statements to Campisi, in which he indicated that his practice was to wait until an alleged infringer's sales volume grew to the point where it was good enough for him to sue them, at which time he would sue for patent infringement. (Campisi Depo. at 48-49.)[12]

107.    ABC contacted Diageo to assert its trade dress rights to the packaging of Daily's frozen cocktail products on April 24, 2012. (Ex. 109); (Aug. 14 Tr. at 226-28). Plaintiffs filed the instant suit on May 8, 2012.

### 2.    *Irreparable Harm*

108.    ABC's primary contention with respect to irreparable harm is the alleged loss of market share in the single-serve RTD frozen cocktail market segment. ABC occupied 99% of that

---

[12] Murray denied that this conversation took place, (Aug. 14 Tr. at 105), but the email (Ex. 53) indicates that he engaged in that behavior.

market segment prior to June 2011, at which point its market share decreased to 59%. (Aug. 14 Tr. at 215-17); (Ex. FF, EEEEE). As of the date of the preliminary injunction hearing, the Parrot Bay frozen cocktail products occupied 26% of that market, while Smirnoff's products occupied 3%. (Ex. FF.)

109.    After Diageo's entry into the frozen RTD pouch market, ABC's sales increased exponentially, from $18,999,419 in sales in 2010 to $69,660,130 in 2011. (Barr Decl. (ECF No. 24-1) ¶¶ 24-25.) The number of units sold likewise experienced a corresponding sales jump. (Id.) ABC's sales in 2012 (prior to the date of Barr's declaration on May 7, 2012) nearly exceeded the total sales in all of 2010, and far exceeded any of ABC's yearly sales numbers prior to that time. (Id.) Therefore, despite Diageo's entry into this market segment, ABC's sales continue to improve at an exponential rate, and increased since Diageo entered the market. (Id.); (Ex. FF.)

110.    Despite ABC's ongoing sales successes, Barr stated that "if [the frozen pouch] business doesn't meet the expectations we have, then that's lost profit to our company." (Aug. 14 Tr. at 190.) Barr testified that after Diageo's entry into the market, ABC did not "get the sales [it] had anticipated," and has had to lay off employees. (Id.)

111.    ABC's sales to Wal-Mart declined after Diageo entered the frozen RTD cocktail market. (Ex. EEEEE.) ABC's customers, however, were on "allocation," because ABC was not able to meet the demand for the Daily's frozen cocktail products. (Aug. 15 Tr. at 67-68.)[13]

112.    ABC points out that the Parrot Bay pouch is prone to leaking, and refers to two photographs which appear to show liquid on the floor under a rack holding Parrot Bay frozen cocktail products. (Ex. HH, II.) ABC believes that consumers of the Diageo products "may associate" any quality issues with the Daily's products.

---

[13] ABC produced no evidence of the exact cause for this loss of sales—whether it resulted from the entry of Diageo into the market or the inability of ABC to meet demand.

113.    Murray testified that PPi could be harmed if it allowed another company to use the design of a pouch that PPi had licensed to another customer. (Aug. 14 Tr. at 54.)

114.    Ward asserted that Diageo could change its pouch design in approximately six months. (Aug. 15 Tr. at 246.) Murray, however, claims that kind of change could take place in three months for either Diageo or ABC. (Aug. 14 Tr. at 88, 220.) Diageo disputes this timeframe based upon the current scale of its production. (Aug. 16 Tr. at 23.)

115.    The frozen RTD cocktail market is subject to seasonality, with sales increasing in the warm summer months and decreasing in the colder winter months. (Aug. 15 Tr. at 218, 249-50.)

116.    Diageo has approximately $19,800,000,000 annually in global sales. (Aug. 16 Tr. at 72.)

## III.    CONCLUSIONS OF LAW

### A.    Preliminary Injunction Standard and Applicable Law

1.    A preliminary injunction is an "extraordinary remedy" that is largely within the discretion of the trial court. Winter v. Natural Res. Defense Council, 555 U.S. 7, 24 (2008). Plaintiffs seeking such a remedy are charged with making a "clear showing" of entitlement to relief. Id. at 22.

2.    Due to the nature of the claims plaintiffs asserted, the court will consider the relevant law of a jurisdiction for each claim, as set forth below.

### 1.    *Plaintiffs' Design Patent Infringement Claim*

3.    With respect to plaintiffs' design patent infringement claims, the court must apply the preliminary injunction standards determined by the Supreme Court and the United States Court of Appeals for the Federal Circuit. Pursuant to 28 U.S.C. § 1295, "[t]he United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction . . . of an appeal from a final

decision of a district court of the United States . . . arising under, any Act of Congress relating to patents." Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 819 (Fed. Cir. 1992).

4.      The plaintiffs, as movants, bear the burden of demonstrating the need for preliminary injunctive relief. Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir. 1994).

5.      To obtain a preliminary injunction, plaintiffs "must establish a right thereto in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest." Hybridtech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988). In proving a reasonable likelihood of success, a plaintiff must show a likelihood of success with respect to both validity and infringement. Id.

### 2.      *Plaintiffs' Trade Dress Infringement Claim*

6.      Plaintiffs' trade dress infringement claim is brought pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq., and therefore the precedents which are controlling for this court are the decisions of the Supreme Court and the Court of Appeals for the Third Circuit. To obtain a preliminary injunction on a Lanham Act claim, a court must consider "(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest." McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 356-57 (3d Cir. 2007) (citing Shire U.S. Inc. v. Barr Laboratories Inc., 329 F.3d 348, 352 (3d Cir. 2003)).

### 3.      *Plaintiffs' Unfair Competition Claim*

7.      Plaintiffs' unfair competition claim arises under Pennsylvania common law and, therefore, is governed by Pennsylvania law.

8.      Federal courts addressing Pennsylvania unfair competition claims and federal Lanham

Act claims, however, apply the same standard[14] to both; thus, the Lanham Act and unfair

competition claims will be considered together for purposes of the present motion. R.J. Ants, Inc.

v. Marinelli Enterprises, LLC, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011) (citing Moore Push-Pin

Co. v. Moore Bus. Forms, Inc., 678 F. Supp. 113, 116 (E.D. Pa. 1987)).

       B.      **Plaintiffs' Design Patent Infringement Claim**

               1.      *Claim Construction*

9.      The parties offer competing claim constructions; and the court must, therefore, first

construe the claim set forth in the '672 patent. "[A] design patent, unlike a utility patent, limits

protection to the ornamental design of the article." Richardson v. Stanley Works, Inc., 597 F.3d

1288, 1293-94 (Fed. Cir. 2010). "'If the patented design is primarily functional rather than

ornamental, the patent is invalid.'" Id. Functionality is defined as a design element that "'is

essential to the use or purpose of the article or if it affects the cost or quality of the article.'"

Amini Innovation Grp. v. Anthony Cal. Inc. 439 F.3d 1365, 1371 (Fed. Cir. 2006) (quoting

Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 (1982)). The court's task, therefore, is

to construe the claim in a way that excludes the purely functional elements.

10.     Unlike in a utility patent case, courts are cautioned to avoid "excessive reliance on a

detailed verbal description in a design infringement case." Crocs, Inc. v. Int'l Trade Comm'n,

598 F.3d 1294, 1302 (Fed. Cir. 2010) The Court of Appeals for the Federal Circuit has held that

courts should construe design patent claims simply as a certain design "as shown in drawings."

Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008). The design claimed in

---

[14] Lanham Act claims have the added requirement of interstate commerce, which is not challenged in the present case. R.J. Ants, Inc. v. Marinelli Enterprises, LLC, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011).

the '672 patent is an ornamental design for a flexible liquid-containing pouch, as shown in Figures 1-8 of Exhibit A.[15] Shown below are Figures 1 through 4 from the '672 patent.



*From left to right, FIG. 1, FIG. 2, FIG. 3, and FIG. 4 from the '672 patent*

### 2.    *Defendants' Challenges to Validity*

11.    At trial, issued patents have a statutory presumption of validity under 35 U.S.C. § 282. Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1327 (Fed. Cir. 2008). A patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation. Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998).

12.    If a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue. See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1365 (Fed. Cir. 2001).

13.    If a patent exists (as in this case), the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial. The challenger satisfies its burden upon raising a "substantial question" about the validity of the patent. Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009). To avoid a conclusion that it is unable to show a

---

[15] Courts have held that the disclosure of multiple embodiments in a design patent is allowable provided that the embodiments involve a single inventive concept. See e.g. Application of Rubinfield, 270 F.2d 391, 396 (C.C.P.A. 1959).

likelihood of success, the patentee then has the burden of responding with contrary evidence, "which of course may include analysis and argument." Id. at 1377.

14.    While the evidentiary burdens at the preliminary injunction stage track the burdens at trial, the ultimate question before the court in determining whether it should grant a preliminary injunction is different. The court in determining whether a preliminary injunction should issue "does not resolve the validity question, but rather must . . . make an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial." New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d 878, 882-83 (Fed. Cir. 1992).

15.    At the preliminary injunction stage, instead of the alleged infringer having to persuade the court that the patent is invalid, it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue. Titan Tire, 566 F.3d at 1376.

16.    Defendants set forth several challenges to the validity of the '672 patent. Defendants argue: (1) that most of the elements claimed in the '672 patent are functional, rendering the patent invalid; (2) that the '672 patent is unclear, indefinite, and non-enabling, and therefore invalid pursuant to 35 U.S.C. § 112; (3) that the design claimed in the '672 patent was on sale more than one year before the application for the '672 patent was filed and therefore the '672 patent lacks novelty and was anticipated; and (4) that the design claimed in the '672 patent would be obvious to one skilled in the art.

### a.    Functionality

17.    "Under 35 U.S.C. § 171 [], a design patent may be granted only for a 'new, original and ornamental design.'" Power Controls, 806 F.2d at 238. Once a patent issues, it is presumed valid

pursuant to 35 U.S.C. § 282, but this presumption can be overcome if the challenger establishes that "the patented design is primarily functional rather than ornamental." Id. "The design of a useful article is deemed to be functional when 'the appearance of the claimed design is 'dictated by' the use or purpose of the article.'" PHG Techs., LLC. v. St. John Companies, Inc., 469 F.3d 1361, 1366 (Fed. Cir. 2006) (quoting L.A. Gear Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1123 (Fed. Cir. 1993)).

18.     Many designs or elements thereof perform some function; however, while "[t]he elements of the design may indeed serve a utilitarian purpose . . . it is the ornamental aspect that is the basis of the design patent." L.A. Gear, 988 F.2d at 1123. "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." Id.

19.     Defendants argue that several elements of the claimed design in the '672 patent are functional, which therefore render the patent invalid, or would at least change the court's infringement analysis. Testimony at the hearing, however, indicated that most of the elements pointed to by defendants as being functional are merely one of many possible alternatives for the design. Plaintiffs note: (1) there are different and less expensive ways to provide tear holes  than the triangle-shaped notches claimed in the '672 patent; (2) there are other choices besides a sombrero hole to hang the pouch, including cuts, circles, ovals, and other size sombrero holes; (3) there are other curvatures that can be applied to the sides of a pouch to create a waist; (4) the waist may be located at different heights on the package;  (5) there are different shapes and patterns for the semicircle seal holes; (6) there are alternative choices for the shape, location and number of cooling holes at the base of the pouch; and (7) there are alternative shapes that can be used to make the bottom gusset on the pouch. Demonstrating "[t]he presence of alternative

designs" can be a significant factor in finding that claimed elements are not functional. Berry Sterling Corp. v. Pescor Plastics, Inc., 122 F.3d 1452, 1456 (Fed. Cir. 1997). The evidence shows that each of these individual elements embodies one of several possible designs. Defendants' evidence with respect to functionality does not contradict the fact that each of these elements can be changed or moved to achieve a different overall look.

20.     Although many of the elements claimed in the '672 patent serve a "function" in the strict sense, defendants' argument focuses on the functional aspect of each individual element, rather than the design in its entirety and "the overall appearance of the article." L.A. Gear, 988 F.2d at 1123. The relevant inquiry when determining functionality is "whether the function performed by the features in question could be accomplished by other designs." Herbko Int'l Inc., v. Gemmy Indus. Inc., 916 F. Supp. 322, 326 (S.D. N.Y. 1996).

21.     Defendants argue that the hourglass shape of the pouch is functional and cannot be patented. Specifically, they point to testimony and other documentary evidence indicating that the curved sides of the pouch offer an "ergonomic" shape that makes the pouch comfortable for the user to hold. Defendants indicate that the waist in the pouch allows the consumer to manipulate the product and it acts as a dam to hold the slush in place. Finally, defendants note other allegedly functional aspects of the hourglass shape, including helping the filling process. Defendants do not, however, point to any evidence indicating that these goals cannot be accomplished by way of other designs. See Oscar Mayer Foods Corp. v. Sara Lee Corp., No. 90-C-43-C, 1990 WL 114745, at *5 (W.D. Wisc. Mar. 20, 1990) ("although many of these [claimed elements] serve some function, they possess the ornamental quality of being subject to variation"). Other design patents introduced as evidence illustrate the multitude of ways that Doyen-style pouches may be designed so as to give them a different overall impression.

Defendants did not raise a "substantial question" whether the '672 patent is invalid based upon functionality. <u>Titan Tire</u>, 566 F.3d at 1376.

22.     It is noteworthy that defendants' expert on package design, who attempted to discount every individual element of the design claimed in the '672 patent as being purely functional, maintained that those same features rendered the design claimed in the '672 patent obvious.

23.     In light of the testimony provided at the preliminary injunction hearing, as well as the myriad other design patents admitted into evidence (many of which are flexible pouches claiming similar elements of different designs), the court concludes that the overall design claimed in the '672 patent is not functional, and plaintiffs are likely to withstand a functionality challenge.

**b.      35 U.S.C. § 112 Indefiniteness**

24.     Defendants challenge the adequacy of the drawings set forth in the '672 patent as a basis for finding the patent invalid under 35 U.S.C. § 112. Section 112 provides

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, **in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same** . . .

35 U.S.C. § 112(a) (emphasis added). For a "design patent to be invalid for indefiniteness, errors and inconsistencies in the patent drawings must be **material and of such magnitude that the overall appearance of the design is unclear**." <u>HR U.S. LLC v. Mizco Int'l, Inc.</u>, No. CV-07-2394, 2009 WL 890550, at *6 (E.D. N.Y. Mar. 31, 2009) (emphasis added).

25.     Defendants propose that the figures in the '672 patent are potentially inconsistent in either of two ways:  first, if the design is meant to embody a sealed pouch (thereby assuming that the lines at the top of Figure 1 are meant to represent seal lines), then defendants maintain that the top portion of the triangle in Figure 2 should be a single vertical line reflecting the sealed

portion at the top of the pouch, which is not present; or second, if the design is meant to embody

a filled, unsealed pouch (which would presumably result in the triangle shape in Figure 2), then

the second horizontal line in Figure 1 (labeled as line 2a in Figure 1 of the '672 patent as shown

in Exhibit 3) is inconsistent, as a seal line would not be present across the top of the pouch.

26.     Testimony at the hearing indicated that the line labeled 2a in Figure 1 is not, in fact, the

bottom of a top seal. Murray testified that Figures 1 and 3 represent an unsealed, filled pouch.

Plaintiffs point out that "[a]s is apparent from viewing a physical sample of a Daily's pouch, line

"2a" in [(Ex. 3)] is a visible line indicative of where the 'top' of a 'top seal' is located once a 'top

seal' is applied to the pouch." (ECF No 95 at 25 (finding of fact 94)). No testimony indicates

whether line 2a would or would not be present in absence of a seal at all. Based upon the record,

the court concludes that defendants did not meet their burden to show the claimed design is

inconsistent as shown in the figures. Defendants' argument to the contrary would require the

court to find that the figures in the '672 patent are inconsistent with drawings in other patents,

which is not sufficient to raise a "substantial question" with respect to inconsistency. See Titan

Tire, 566 F.3d at 1376 (requiring a showing that raises a "substantial question" in order to show

invalidity).

27.     Defendants argue that the tear notches portrayed in the '672 patent are indefinite;

specifically, the fact that the notches shown in Figures 1 and 3 (of the first embodiment) are

bounded on one side by a solid line that corresponds to the outside edge of the pouch. When

asked why the line representing the "outer periphery of the pouch" closed in the tear notches,

however, Murray responded "I have no idea. Ask the designer, the guy that drew this." (Murray

Dep. at 127.) Plaintiffs did not adduce any evidence that would satisfy their burden of rebutting

the evidence of indefiniteness set forth by defendants. Titan Tire, 566 F.3d at 1379. Despite this

lack of evidence, however, the question remains whether the suggested indefiniteness is "material and of such magnitude that the overall appearance of the design is unclear." HR U.S., 2009 WL 890550, at *6.

28.     Although there is certainly a question with respect to whether the notches claimed in the '672 patent are open or closed, the court finds that the figures themselves are consistent with each other and that any question over the meaning of a particular feature does not render the overall design unclear; rather, the question is limited to only one element. The overall appearance of the flexible pouch claimed in the '672 patent is not rendered unclear by the presence or absence of open or closed tear notches. As such, the court concludes that, although defendants raised a question with respect to indefiniteness, the question is not so substantial as to preclude plaintiffs from likely establishing that the patent is valid under § 112.

### c.      Defendants' § 102 Anticipation Claims

29.     A design patent is anticipated if the claimed design was "in public use or on sale in this country, more than one year prior to the date of the application" for the design patent. 35 U.S.C. § 102(b).

30.     Defendants contend that the design claimed in the '672 patent (pictured below on the right) is embodied in several prior art references, including the Party Pouch (pictured below on the left), which was on sale as early as 2005.



31.     Comparing the Party Pouch with the design claimed in the '672 patent, there are

substantial differences that would be readily apparent to an ordinary observer.[16] First, the Party

Pouch does not have a sombrero hole for hanging the product (which is claimed in the '672

patent), but it does have a zipper closure (which is not claimed in the '672 patent). Second, the

corners at the top of the waist on the Party Pouch are quite different from those on the '672

patent, insofar as they are sharper and have a more angular appearance. Third, the sides of the

pouch below the waist are significantly different, as the sides on the Party Pouch appear to be

angled inward, while the sides on the design claimed in the '672 patent below the waist remain

parallel. Fourth, the waist of the Party Pouch appears to be lower overall than the waist on the

design claimed in the '672 patent.

32.     The bases of the pouches when viewed from below also differ, in that the base of the

Party Pouch has a distinctly hexagonal shape, while the design claimed in the '672 patent has a

rounded, lenticular shape. Although both have "fins" extending from the sides of the base (as

dictated by the side seals), the fins on the Party Pouch are shorter and less defined then they are

---

[16] The "ordinary observer" test is the sole test for design patent invalidity under § 102. Int'l Seaway Trading Corp. v.
Walgreens Corp., 589 F.3d 1233, 1240 (Fed. Cir. 2009).  The relevant inquiry is, therefore, whether "in the eye of an
ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the
resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the
first one patented is infringed by the other." Gorham Co. v White, 81 U.S. 511, 528 (1871).

in the design claimed in the '672 patent. Finally, when viewed from the side, there are significant differences between the Party Pouch and the design claimed in the '672 patent. Presumably based upon the volume of the base of the pouch, the Party Pouch essentially forms a straight line from just above the midpoint of the pouch, and is much wider and bulbous below the midpoint. The '672 patent claims a wedge shape with straight sides that becomes gradually thinner from bottom to top. There is no similar change in the Party Pouch. Based upon this comparison, the court concludes that the overall appearance of the Party Pouch is not so substantially similar to the design claimed in the '672 patent, and that PPi is likely to survive any anticipation challenges.

33.     Defendants cite several other prior art references that they argue show that the '672 patent lacks novelty pursuant to § 102. In their moving papers, however, defendants concede that there are differences between this prior art and the '672 patent. (ECF No. 96 at 54) ("[t]he lenticular shapes shown are not *exactly* the same . . ."). Therefore, to the extent that this prior art is not "substantially the same" as that claimed in the '672 patent, defendants failed to raise a substantial question with respect to validity. Therefore, the court concludes that plaintiffs are likely to withstand a challenge to the '672 patent's novelty pursuant to § 102.

### d.     Defendants' § 103 Obviousness Claims

34.     Defendants argue that even if the '672 patent survives a challenge pursuant to § 102, it would be obvious to those possessing ordinary skill in the art. Section 103 of the Patent Act provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in [§ 102], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

43

35 U.S.C. § 103.

35.    Obviousness is a question of law based on underlying factual inquiries including: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of nonobviousness." Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH, 139 F.3d 877, 881 (Fed. Cir. 1998).

36.    "[T]he ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." Durling v. Spectrum Furniture Co., 101 F.3d 100, 103 (Fed. Cir. 1996) (citing In re Rosen, 673 F.2d 388, 390 (C.C.P.A. 1982)). This general principle translates into "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design." Id. (citing In re Borden, 90 F.3d 1570, 1574 (Fed. Cir. 1996)).

37.    First, "one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" Id. (quoting In re Rosen, 673 F.2d at 391); Apple, Inc. v. Samsung Elecs. Co., Ltd., 678 F.3d 1314, 1329 (Fed. Cir. 2012). Second, once the primary reference is found, other "secondary" references "may be used to modify it to create a design that has the same overall visual appearance as the claimed design." Id. The design of these secondary references, however, must be "'so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" Id. (quoting In re Borden, 90 F.3d at 1575 (alteration in original)).

38.    "For design patents, the role of one skilled in the art in the obviousness context lies only in determining whether to combine earlier references to arrive at a single piece of art for

comparison with the potential design or to modify a single prior art reference." Int'l Seaway,

589 F.3d at 1240.  "Once that piece of prior art has been constructed, obviousness, like

anticipation, requires application of the ordinary observer test, not the view of one skilled in the

art." Id.

39.     Both the ordinary observer test, whether applied for infringement or invalidity, and the

obviousness test, applied for invalidity under § 103, focus on the overall designs. OddzOn

Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997).

40.     Kimmel relied upon Figure 9 from United States Patent No. 6,912,825 (Ex. 43) (the

"'825 patent") as the primary reference for his obviousness analysis. Kimmel opined that Figure

9 of the '825 patent is "very similar to" Figure 5 in the '672 patent. (Aug. 22 Tr. 30.) Kimmel

only looked, however, to the curves above and below the waist on the purported primary

reference designs in reaching this conclusion—he concluded that "[t]he other differences relate

to purely functional features." (Aug. 22 Tr. at 30.)

41.     Kimmel's conclusion does not comport with the court's construction of the design

claimed in the '672 patent, and a comparison between the '825 patent and the '672 patent reveals

that they are not "basically the same." The court initially concludes that the pouch depicted in the

'825 patent is of a different proportion than that claimed in the '672 patent, because the width is

almost the same as the height. The design claimed in the '672 patent is substantially taller than it

is wide.[17] The overall impression is thus of a square shape, rather than an elongated rectangle, as

claimed in the '672 patent. Additionally, the '825 patent only discloses a single tear notch, which

is much larger than the two tear notches on the '672 patent. The '825 patent does not disclose the

two circles or "cooling holes" at the base, as the '672 patent does. The '825 patent does not

_____

[17] The court finds that the distinction is not simply a function of scale, as defendants contend; rather, it is a function of proportion.

disclose a sombrero hole, as the '672 patent does. The curvatures forming the waist of the '825 patent do not appear to be as deep or as tall as those claimed in the '672 patent. The bottom corners of the two claimed designs are also different, with the corners of the '825 patent being sharp, whereas the corners of the '672 patent are rounded.

42.     Figure 4 of the '825 patent (showing a side view) does not resemble Figure 2 of the '672 patent, insofar as the front and back of the pouch in Figure 4 of the '825 patent remain parallel to each other from the bottom to near the top, where they sharply curve together to form a point. Figure 2 of the '672 patent, however, claims a triangular shape wherein the sides continuously come together to a point at the top—the sides are never parallel.

43.     Based upon this comparison, the court concludes that the overall impression of the prior art cited by the defendants is not "basically the same" as the '672 patent, and thus cannot serve as a primary reference for defendants' obviousness analysis.

44.     Defendants contend that the design claimed in the '672 patent would have been obvious in light of several other pieces of prior art, including two prior pouches used for Daily's products, (Ex. 31, 32), Minute Maid pouches, (Ex. 43), and the Party Pouch. Defendants maintain that each can be modified or combined with other prior art (including the straight upper sides of the "traditional Sadlesprings pouch") (Ex. 20) in order to create a hypothetical reference that would render the '672 patent invalid under § 103.

45.     As indicated above, the court found that the Party Pouch does not raise a substantial question with respect to whether an ordinary observer would confuse it with the design claimed in the '672 patent. With respect to the prior Daily's pouches (Ex. 31, 32), the court finds that they are not "basically the same." Durling, 101 F.3d at 103. The overall impression of Exhibits 31 and 32 is different from the design claimed in the '672 patent because the smaller, rounded,

balloon-like top portion of those pouches is different from the large rectangular, more imposing

top portion claimed in the '672 patent. The lack of a sombrero hole also contributes to the

smaller overall impression of the top portion of Exhibits 31 and 32. With respect to Exhibit 31,

the court also notes that the gusset is distinctly square or hexagonal in shape, much like the Party

Pouch. The square shape gives the impression that the sides of the pouch, below the waist, angle

inward toward the bottom, rather than being largely straight as reflected in the design claimed in

the '672 patent.

46.     PPi sets forth evidence of other objective indicia that bolster the court's finding of

nonobviousness. <u>Monarch Knitting</u>, 139 F.3d at 881. As indicated above, Diageo employees

sought to "copy" the Daily's pouch (which embodies the '672 patent), despite initially having

tried to create their own pouch with the "parrot wing" design. Evidence of copying is

"'indicative of unobviousness.'" <u>Specialty Composites v. Cabot Corp.</u>, 845 F.2d 981, 991 (Fed.

Cir. 1988) (quoting <u>Windsurfing Int'l, Inc. v. AMF, Inc.</u>, 782 F.2d 995, 1000 (Fed. Cir. 1986)).

47.     For these reasons, the court concludes that plaintiffs are likely to withstand defendants'

invalidity claims. <u>Hybridtech</u>, 849 F.2d at 1451.

### 3.     *Plaintiffs' Infringement Claims*

48.     A determination of design patent infringement involves a two-step analysis. First, the

claim must be properly construed to determine its meaning and scope. The court already

completed the claim construction step as discussed above. Second, the properly construed claim

must be compared to the accused design to determine whether there has been infringement.

<u>Elmer v. ICC Fabricating, Inc.</u>, 67 F.3d 1571, 1577 (Fed.Cir.1995).

49.     The second step requires that the patentee establish that an ordinary observer, familiar

with the prior art designs, would be deceived into believing the accused product is the same as

the patented product. <u>Egyptian Goddess</u>, 543 F.3d at 672; <u>Stanley Works</u>, 597 F.3d at 1295.

Under this test, if an ordinary observer, familiar with prior art designs, giving the degree of

attention normally given by a purchaser, would be deceived into believing that the defendants'

products are the same as the design claimed in the '672 patent, there is infringement. <u>Id.</u>

50.    The ordinary observer must "view the differences between the patented design and the

accused product in the context of the prior art" such that "the attention of the hypothetical

ordinary observer will be drawn to those aspects of the claimed design that differ from the prior

art." <u>Egyptian Goddess</u>, 543 F.3d at 676.

51.    Design patent infringement is a question of fact. <u>Stanley Works</u>, 597 F.3d at 1295.

52.    If the claimed design is close to the prior art designs, small differences between the

accused design and the claimed design assume more importance to the eye of the hypothetical

ordinary observer. <u>Stanley Works</u>, 597 F.3d at 1295. The ordinary observer, however, will likely

attach importance to those differences depending on the overall effect of those differences on the

design. <u>Id.</u> Even if the claimed design simply combines old features in the prior art, it may still

create an overall appearance deceptively similar to the accused design. In other words, "the

deception that arises is a result of the similarities in the overall design, not of similarities in

ornamental features considered in isolation." <u>Amini Innovation</u>, 439 F.3d at 1371.

53.    "Similarity 'is not to be determined by making too close an analysis of detail,'

nonetheless, 'where in a crowded art the composite of differences presents a different impression

to the eye of the average observer . . . infringement will not be found.'" <u>Egyptian Goddess</u>, 543

F.3d at 675 (quoting <u>Applied Arts Corp. v. Grand Rapids Metalcraft Corp.</u>, 67 F.2d 428, 430 (6th

Cir. 1933)).

54.     The ordinary observer test applies to the patented design in its entirety, as it is claimed.

See Braun, Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 820 n.7 (Fed. Cir. 1992) (quoting

Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed.Cir.1984)).

55.     "[M]inor differences between a patented design and an accused article's design cannot,

and shall not, prevent a finding of infringement." Litton, 728 F.2d at 1444.

56.     One approach recognized by the Court of Appeals for the Federal Circuit in Egyptian

Goddess is a three-way visual comparison between the patented design, the accused design, and

the closest prior art. Egyptian Goddess, 543 F.3d at 672.

57.     As indicated above, there are substantial similarities between the Parrot Bay pouch

(which shares a die line with the Smirnoff pouch, thus making them the same) and the design

claimed in the '672 patent. Defendants' evidence to the contrary impermissibly focuses on fine

details and individual elements of the design, rather than the overall impression, as required in

Amini Innovation, 439 F.3d at 1371. Moreover, defendants' proposed infringement analysis

relies heavily upon their claim constructions that improperly discount several ornamental

features of the '672 patent, and which the court already rejected based upon testimony at the

hearing. On this basis, the court concludes that defendants failed to meet their burden, and

plaintiffs are likely to succeed on the infringement issue.[18]

## C.     Plaintiffs' Trade Dress Infringement and Unfair Competition Claims

58.     Trade dress "has been defined as the total image or overall appearance of a product, and

includes, but is not limited to, such features as size, shape, color or color combinations, texture,

---

[18] On March 4, 2013, plaintiffs filed a motion to supplement the record (ECF No. 114) in the present case and sought to introduce photographs of a pouch shape being used by Diageo in European markets. Because the court determined that plaintiffs showed a likelihood of success on the merits of its design patent infringement claim, consideration of the supplemental materials is unnecessary and the motion is DENIED.

graphics, or even a particular sales technique." <u>Rose Art Indus., Inc. v. Swanson</u>, 235 F.3d 165,

171 (3d Cir. 2000) (citing <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 765 n.1 (1992)).

59.     The plaintiff seeking trade dress protection defines precisely what the trade dress is, and

"is free to seek trade dress protection for whatever products or packaging it sees fit." <u>Id.</u> at 173.

The alleged trade dress must, however, have been used in a way that it denotes the product's

source. <u>Duraco Prods. v. Joy Plastic Enters., Ltd.</u>, 40 F.3d 1431, 1441 (3d Cir. 1994).

60.     Trade dress infringement differs from trademark infringement because the trade dress

encompasses the totality of the elements, and the overall impression made by the identified

elements: "[s]imulation amounting to unfair competition does not reside in identity of single

features of dress or markings . . . but is to be tested by the general impression made by the

offending article upon the eye of the ordinary purchaser or user." <u>Cheesbrough Mfg. Co. v. Old</u>

<u>Gold Chem. Co., Inc.</u>, 70 F.2d 383, 384 (6th Cir. 1934).

> In examining trade dress the focus is on the **entire** look of the product or
> packaging. Individual aspects of a trade dress may be eligible for trademark
> protection in their own right, but in an action for trade dress infringement each
> aspect should be viewed in relation to the entire trade dress.

<u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1042 (2d Cir. 1992).

### 1.     *Plaintiffs' Claimed Trade Dress*

61.     To effectively assert a claim for trade dress infringement, a plaintiff must provide "a

precise expression of the character and scope of the claimed trade dress" that describes the trade

dress that it seeks to protect. <u>Landscape Forms, Inc. v. Columbia Cascade Co.</u>, 113 F.3d 373, 381

(2d Cir. 1997).

62.     Plaintiff offered the following list of elements that comprise its trade dress:

> In addition to its hourglass shape, ABC's trade dress includes three horizontal
> labeling partitions, with the top-most portion consisting of a perforated tear-away
> flap with the language "FREEZE AND ENJOY," the middle portion containing

the Daily's brand name, a colorful depiction of the particular frozen cocktail flavor and corresponding fruit imagery, and the bottom portion identifying the specific product and key information thereof.

(ECF No. 9 at 17-18.)

## 2. *Likelihood of Success on the Merits*

63.    To establish a likelihood of success on the merits of their trade dress infringement and unfair competition claims, plaintiffs must make three showings: (1) the trade dress design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) ordinarily prudent consumers are likely to be confused about the source of the products. McNeil Nutritionals, 511 F.3d at 357.

64.    Trade dress "refers to the design or packaging of a product which serves to identify the product's source." Shire US Inc. v. Barr Labs. Inc., 329 F.3d 348, 353 (3d Cir. 2003) (citing TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28 (2001)).

65.    The Court of Appeals for the Third Circuit has held that in cases where a party seeks trade dress protection for an entire line of products, courts must first determine whether the line has a "recognizable and consistent overall look." Rose Art, 235 F.3d at 173.

### a.    Consistent Overall Look

66.    The "consistent overall look" standard articulated in Rose Art does not require "that the appearance of the series or line of products or packaging be identical." Id. Instead, "'a party may have trade dress rights even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression.'" Id. (quoting Rose Art Industries, Inc. v. Raymond Geddes and Co., 31 F. Supp. 2d 367, 373 (D. N.J. 1998)). The Court of Appeals for the Third Circuit adopted this standard for a line of products because when a party seeks trade dress protection for

51

an entire line of products, the "'concern for protecting competition is acute.'" Id. at 172 (quoting

Landscape Forms, 113 F.3d at 380). In Rose Art, the court of appeals determined that a line of

products had a consistent overall look even though the products were not the same. Id. at 170

(noting that one line of allegedly protected products included "crayons, bold and classic markers,

colored pencils, and modeling clay").



67.  As seen in the image above, the packaging for the Daily's frozen cocktail products

satisfies the "consistent overall look" standard because the entire line shares a commonality of

features that contribute to the consistent overall look of the alleged trade dress.

68.  All the products have packaging which is exactly the same size and shape and shares

common graphic elements which contribute to the consistency across the line. Those elements

include: (1) the distinctive "DAILY'S" trademark name in foil text on a black background with

the outline of a martini glass forming the "Y" in the name; (2) the solid-color bands at the very

top and very bottom of the pouch, the top one with the words "FREEZE AND ENJOY" and the

bottom one with alcohol content and package volume information; (3) the placement of the

"ALCOHOL IS IN IT!" notice approximately one-third of the way down the package on the

right-hand side, written in a distinctive black-on-silver text; and (4) the use of the "swirl" pattern

as the background for the central image on the package. The central image itself also contributes

to the overall consistency because each of the images contain a glass with fruit splashing into it, and fruit located at generally the ten o'clock and five o'clock positions around the glass.

69.     Defendants dispute whether certain elements of the Daily's frozen cocktail products' trade dress are functional or lack distinctiveness. As discussed below, those arguments lack merit and do not discount the uniformity exhibited across the entire line of those products. Based upon the test articulated in Rose Art, the court concludes that it is likely a reasonable jury would find that the Daily's frozen cocktail products have a consistent overall look, allowing the court to proceed to plaintiffs' trade dress infringement claim.

### b.     Functionality

70.     "In a civil action for trade dress infringement under [the Lanham Act] for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). Unfortunately, the "definition of 'functionality' has not enjoyed such clarity." Shire US, 329 F.3d at 353. Functionality is a determination of fact. Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1002 (2d Cir. 1997); see Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984) (acknowledging that the district court's factfinding is subject to the clearly erroneous standard of review).

71.     Courts have recognized that "[f]unctional features are by definition those likely to be shared by different producers of the same product and therefore are unlikely to identify a particular producer." Publ'ns Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 340 (7th Cir. 1998). The traditional rule set forth by the Supreme Court is that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 850 n.10 (1982). The Supreme Court

expanded the policy considerations contained in the traditional definition by noting that a feature is functional "if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (citing Inwood Labs., 456 U.S. at 850 n.10). The Court of Appeals for the Third Circuit has cited approvingly to the Supreme Court definition in Inwood Labs., noting that "[t]his formulation is congruent with our recent statement that a feature of goods is considered non-functional if 'the element of the product serves no purpose other than identification.'" Ideal Toy Corp. v. Plawner Toy Mfg. Corp., 685 F.2d 78, 81 (3d Cir. 1982) (quoting SK&F, Co. v. Premo Pharm. Labs., Inc., 625 F.2d 1055, 1063 (3d Cir. 1980)).

72.     The existence of a design patent is presumptive proof of nonfunctionality. Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc., 461 F.3d 675, 683-84 (6th Cir. 2006). As indicated above, plaintiffs produced substantial evidence indicating that the shape of the Daily's pouch is not "essential" to the purpose of the frozen cocktail—indeed, the evidence indicates that the shape actually increases the cost of making the pouch. To the extent that plaintiffs established a likelihood of success on the merits with respect to the functionality issue in their design patent claim, the court will conclude it is likely that a reasonable jury would find that the trade dress is nonfunctional.

### c.     Inherently Distinctive/Secondary Meaning

73.     ABC must next demonstrate that the Daily's frozen cocktail products' trade dress is inherently distinctive or has acquired secondary meaning in the marketplace. With respect to product packaging trade dress,[19] such as the packaging for the Daily's frozen cocktail products, a

---

[19] The Supreme Court in Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205 (2000), drew a distinction between "product design trade dress" and "product packaging trade dress," finding that the former could never be considered inherently distinctive and therefore required a showing of secondary meaning. Id. at 216. For purposes of

plaintiff may show that the alleged trade dress is inherently distinctive or has acquired secondary meaning. Two Pesos, 505 U.S. at 769.

### i.      Inherent Distinctiveness

74.      Trade dress is inherently distinctive if "[its] intrinsic nature serves to identify a particular source of a product." Two Pesos, 505 U.S. at 768. Inherent distinctiveness is lacking where it is "not reasonable to assume consumer predisposition to take . . . packaging as an indication of source." Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 213 (2000). Courts have acknowledged that "because 'the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive.'" McNeil Nutritionals v. Heartland Sweeteners LLC, 566 F. Supp. 2d 378, 388 (E.D. Pa. 2008) (quoting Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 583 (2d Cir. 1993) (applying the Abercrombie test discussed below)).

> Trade dresses often utilize commonly used lettering, styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion. While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of the court's analysis of distinctiveness.

Paddington, 996 F.2d at 584.

75.      Courts have differed over the appropriate test for inherent distinctiveness with respect to product packaging trade dress. In a leading trade dress decision from the United States District Court for the Eastern District of Pennsylvania, the court relied upon the spectrum of categories set forth in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976), which are used to establish distinctiveness with respect to trademarks. McNeil Nutritionals, 566 F.

---

the present case, the court finds that the Daily's trade dress, as product packaging, could be found distinctive under either the inherent distinctiveness or secondary meaning tests.

Supp. 2d at 388 (citing <u>Abercrombie</u>, 537 F.2d at 9).[20] In <u>Abercrombie</u>, 537 F.2d at 9, the Court

of Appeals for the Second Circuit set forth several categories of marks with increasing

distinctiveness: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." <u>Id.</u> at

9. Defendants maintain that the individual elements of the Daily's frozen cocktail products' trade

dress are generic or descriptive, which does not give rise to a presumption of inherent

distinctiveness. <u>Id.</u>

76.     In a leading treatise, however, there is a suggestion that the <u>Abercrombie</u> test is not

appropriate for the unique combinations of shapes and images associated with product packaging

trade dress, asserting that the preferred test is set forth in <u>Seabrook Foods, Inc. v. Bar-Well</u>

<u>Foods, Ltd.</u>, 568 F.2d 1342, 1344 (C.C.P.A. 1977).[21] MCCARTHY ON TRADEMARKS § 8:13 ("In

the author's view, the <u>Seabrook</u> test is by far the preferable test to classify inherently distinctive

trade dress in packaging and containers."). Despite this suggestion, the Court of Appeals for the

Third Circuit has never applied the <u>Seabrook</u> test to a product packaging trade dress case. The

parties in the present case couched their inherent distinctiveness arguments in terms of the

<u>Abercrombie</u> test, and the court will do the same.

77.     "An arbitrary or fanciful trade dress neither describes nor suggests anything about the

product, while a suggestive trade dress requires consumer 'imagination, thought, or perception'

to demonstrate what the product is." <u>McNeil Nutritionals</u>, 566 F. Supp. 2d at 388 (quoting <u>A &</u>

<u>H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 221-22 (3d Cir. 2000)). Trade

---

[20] The Court of Appeals for the Third Circuit, however, has rejected the application of the <u>Abercrombie</u> spectrum in the context of product design trade dress. <u>Duraco Prods.</u>, 40 F.3d at 1434 ("[w]e conclude that traditional trade dress doctrine does not 'fit' a **product configuration** case because **unlike product packaging**, a product configuration differs fundamentally from a product's trademark" (emphasis added)).

[21] Under <u>Seabrook</u>, courts must consider whether the trade dress: (1) "was a 'common' basic shape or design;" (2) "was unique or unusual in a particular field;" and (3) "was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." <u>Seabrook</u>, 568 F.2d at 1344. <u>Seabrook</u> includes a fourth factor applicable to trademarks, but not to inherent distinctiveness of trade dress. MCCARTHY ON TRADEMARKS § 8:13 n.15.

dress is merely descriptive if it conveys "'an immediate idea of the ingredients, qualities or characteristics of the goods.'" Id. (quoting A & H Sportswear, 237 F.3d at 221-22).

78.     Based upon the Abercrombie factors, the court concludes that the Daily's frozen cocktail products' trade dress is inherently distinctive because the majority of the claimed elements are either suggestive, arbitrary, or fanciful, which, taken as a whole, serve to identify ABC as the source of the product. The hourglass shape of the Daily's frozen cocktail products' packaging is entirely arbitrary or fanciful insofar as it provides no indication of what the product is or what the package contains. The horizontal banding on the packaging, including the prominent placement of the Daily's trademark in black with silver lettering, strongly indicates the source of the product, i.e. ABC. Even the distinctive type and use of the phrases "FREEZE AND ENJOY" and "ALCOHOL IS IN IT!" merely suggest that the product is frozen and contains alcohol, but still require the buyer to use his or her imagination about the exact nature of the product. The "swirl" pattern in the central banding is certainly arbitrary or fanciful, as it does not indicate anything about the product. Even the fruit imagery in the central portion of the package, swirling around and in the glass, is merely suggestive with respect to the nature of the product insofar as it does not contain actual pieces of fruit. Taken together, these inherently distinctive elements make up nearly all the Daily's frozen cocktail products' trade dress, thus weighing in favor of a finding of inherent distinctiveness.

79.     Defendants point to the image of the glass and the color of the packaging as evidence that the overall trade dress is descriptive or generic and, therefore, not subject to protection. A court has, however, rejected the notion that the "combination and refinement of common elements already found in the packaging of other . . . products" precludes trade dress protection. McNeil Nutritionals, 566 F. Supp. 2d at 389 (finding that the Splenda sweetener packaging was

inherently distinctive "despite the fact that many of the pictorial elements of the Splenda trade dress are descriptive or suggestive"). The defendants in McNeil Nutritionals pointed out that:

> McNeil chose yellow for the Splenda packaging to capitalize on consumers' association of yellow with sugar, that McNeil followed the established custom of depicting coffee and iced tea, fruit and baked goods on Splenda's packaging, that virtually every no-calorie sweetener employs blue italicized lettering on its packaging, and that Splenda's color scheme of yellow background with blue and white lettering mimicked the color scheme of existing sweeteners.

Id. Despite these arguments, the court in McNeil Nutritionals focused upon the "combination of pictorial elements, colors, labeling, and layout" in finding that the trade dress was inherently distinctive. Id.

80.    The overall combination of elements embodied in the Daily's frozen cocktail products' trade dress is inherently distinctive. Although some of the elements are somewhat descriptive, packaging would be pointless without at least some description of the product contained therein. Like the court of appeals in McNeil Nutritionals found, it is not the descriptive nature of the individual elements that must be considered, but the overall impression of the combination of those elements. Id. Viewed as a whole, the unique shape and combination of text, images, and layout of the Daily's frozen cocktail products' packaging serves to identify its source, and ABC is likely to succeed in showing that the trade dress of those products is inherently distinctive.

### ii.    Secondary Meaning

81.    Even if the Daily's frozen cocktail products' trade dress lacked inherent distinctiveness, the court could still find that ABC is likely to succeed in showing the trade dress has acquired secondary meaning in the marketplace, thus satisfying the second requirement in the trade dress analysis. Two Pesos, 505 U.S. at 769.

82.    Trade dress acquires secondary meaning when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the

product itself." <u>Inwood Labs.</u>, 456 U.S. at 851 n.11. The test, therefore, is whether the trade dress

is "interpreted by the consuming public to be not only an identification of the products or

services, but also a representation of the origin of those products or services." <u>Commerce Nat'l</u>

<u>Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.</u>, 214 F.3d 432, 438 (3d Cir. 2000).

83.     A plaintiff must establish secondary meaning in its trade dress "at the time and place that

the defendant began use of the [trade dress]." <u>Id.</u> (citing <u>Scott Paper Co. v. Scott's Liquid Gold,</u>

<u>Inc.</u>, 589 F.2d 1225, 1231 (3d Cir. 1978)). The court must, therefore, determine whether the trade

dress for the Daily's frozen cocktail products had acquired secondary meaning at the time

defendants' products entered the market in the summer of 2011.

84.     In determining whether trade dress has achieved secondary meaning, the Court of

Appeals for the Third Circuit has identified a nonexclusive list of factors to consider:

> (1) the extent of sales and advertising leading to buyer associations; (2) length of
> use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6)
> customer testimony; (7) the use of the mark in trade journals; (8) the size of the
> company; (9) the number of sales; (10) the number of customers; and, (11) actual
> confusion.

<u>Id.</u> (citing <u>Ford Motor Co. v. Summit Motor Prods.</u>, 930 F.2d 277, 292 (3d Cir. 1991)).

85.     The parties spend a significant amount of time disputing the degree of relevance to be

afforded the first factor—the extent of sales and advertising leading to buyer associations.

Defendants maintain that ABC's largest advertising expenditures and sales occurred after

defendants' products entered the market. Defendants also argue that ABC's advertising does not

emphasize the packaging of the Daily's products by employing "look for" techniques, but

focuses on the Daily's brand, which defendants maintain is not as probative of secondary

meaning.

86.    Sales evidence indicates that the Daily's frozen cocktail products have enjoyed considerable market success. From their launch in 2005 until the summer of 2011, the Daily's frozen cocktail products occupied 99% of the market share for the single-serve, RTD frozen cocktail segment. Since 2005, ABC's sales of the Daily's frozen cocktail products increased every year, more than tripling from 2006 to 2007, at the time the Daily's pouch in issue was introduced. Prior to 2011, ABC sold approximately 33,031,392 units of Daily's frozen cocktail products, which resulted in a total sales amount of $29,439,917.

87.    Defendants note that a large portion of ABC's sales occurred after defendants entered the frozen RTD market. Defendants do not, however, indicate how this is relevant to a determination of secondary meaning or contradict the undisputed success of the Daily's frozen cocktail products both before and after 2011. Prior to 2011, ABC's sales of the Daily's frozen cocktail products were significant, and showed a significant increase every year after ABC created the market. ABC more than doubled or tripled the prior year's sales almost every year from 2005-2011. Sales of the Daily's frozen cocktail products in 2010 (the last full year before defendants entered the market) appear to be more than 1000 times higher than they were in 2005. Evidence of sales increases in a product packaging trade dress case "readily lead[s] to an inference of source identification and consumer interest in the source." McNeil Nutritionals, 566 F. Supp. 2d at 392 (citing Duraco Prods., 40 F.3d at 1452-53).

88.    Evidence of extensive advertising likewise can "create[] in the mind of consumers an association between the [trade dress] and the provider of the services advertised under the [trade dress]." Commerce Nat'l Ins., 214 F.3d 432 at 438. Expenditure of advertising dollars alone, however, is not sufficient to show secondary meaning, as courts have acknowledged that although "evidence of advertising and sales figures conclusively demonstrates that [a plaintiff]

'hoped the term would acquire secondary meaning, nothing shows that it achieved this goal.'" ComponentOne, L.L.C. v. Componentart, Inc., No. 05cv1122, 2008 WL 4790661, at *12 (W.D. Pa. Oct. 27, 2008) (quoting E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 199 (3d Cir. 2008)).

89.     With respect to advertising, ABC maintains that since 2007 it spent a significant portion of its advertising budget, or nearly $10 million, on advertising the Daily's frozen cocktail products. ABC did not provide a breakdown with respect to how much was spent on advertising for each individual year, but Barr's testimony and declaration indicate that ABC spent, on average, more than $215,000 per year between 2005 and 2011.

90.     The evidence of advertising presented at the preliminary injunction hearing featured images of the alleged Daily's frozen cocktail products' trade dress. The advertising for those products was spread across a wide variety of publications, including publications that appear to be trade publications such as "Bev Media," and "Bev Spec." ABC consistently advertised in trade publications between 2007 and 2012, which weighs heavily in favor of a finding of secondary meaning. Commerce Nat'l Ins., 214 F.3d at 438. ABC's advertising was featured in consumer publications such as Cosmopolitan, Vogue, Shape, InStyle, Glamour, and Woman's Day. By 2010, the Daily's frozen cocktail products were advertised on a national scale. Based upon ABC's progression from advertising in regional and trade publications beginning in at least 2007 to broad-based national consumer advertising in 2010, it appears as though sales grew as advertising dollars were spent. This strengthens the court's conclusion that ABC is likely to succeed in showing that its advertising dollars led to an increase in sales, which supports an inference of secondary meaning. McNeil Nutritionals, 566 F. Supp. 2d at 392.

91.     Defendants make two arguments seeking to minimize the impact of advertising on secondary meaning. First, defendants argue that ABC's advertising does not direct consumers to "look for" the Daily's products based upon their trade dress. Advertising need not direct consumers to "look for" a particular trade dress, however, in order to be probative of secondary meaning. Id. at 391 (noting that "[t]he Third Circuit has not held that only 'look for' advertising can be considered when analyzing whether a trademark or trade dress has acquired secondary meaning"). As indicated above, every advertisement admitted into evidence (including the television advertisements) portrays the Daily's frozen cocktail products. Although "look for" advertising would provide stronger evidence of secondary meaning, the advertisements presented by plaintiffs help consumers and trade professionals connect the Daily's products' trade dress to their source—ABC.

92.     Defendants' second argument points to differences between the current Daily's pouch's shape and the pouches actually portrayed in ABC's advertisements. Although there is a difference in shape between the pouches portrayed in the advertising and the Daily's pouch in issue, that difference is not sufficient to preclude a finding of secondary meaning. Id. at 392 ("[w]hile [the plaintiff] has refreshed its packaging over time, the changes have been minor" and thus do not weigh against a finding of secondary meaning). Defendants ignore the other elements of the trade dress portrayed in the advertisements (including the generally hourglass shape of the pouch). The difference in packaging as part of ABC's advertising does not preclude a finding of secondary meaning.

93.     Several other factors also weigh heavily in favor of a finding of secondary meaning. With respect to length of use and exclusivity of use, the evidence indicates that for six years—between 2005 and 2011—Daily's frozen cocktail products possessed 99% of the market share of frozen

RTD cocktails. Since at least 2007, ABC has used the current trade dress for those products, and prior to that, only used slight variations. These factors weigh heavily in favor of a finding of secondary meaning. See Id. (finding that the use of trade dress for over six years, even with minor changes, weighs in favor of secondary meaning).

94.     Evidence of intentional copying also "strongly supports an inference of secondary meaning," Vision Sports, Inc. v. Melville Corp, 888 F.2d 609, 615 (9th Cir. 1989), but courts have emphasized that it is one of many considerations, "and does not alone establish secondary meaning." Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 419 (6th Cir. 2006).

95.     Plaintiffs' evidence of defendants' copying the Daily's frozen cocktail products' packaging weighs somewhat in favor of a finding of secondary meaning. When trying to quickly enter the market for single-serve, RTD frozen cocktails, defendants engaged in a process of "wargaming" or "competitive benchmarking" by essentially reverse engineering the Daily's product's packaging from the perspective of both the producer and the consumer. In an effort to capture the "value . . . perception" in the "overall pack appearance" of the Daily's products, defendants looked closely at the Daily's frozen cocktail products. During the development process, Rob Warren, a Diageo employee, posed a question to a fellow employee: "Mike: What merchandising creativity can we steal from Dailys?" Plaintiffs assert that defendants referred to a Daily's frozen cocktail product when designing the Parrot Bay products' trade dress. They point to evidence that defendants looked at the overall appearance of the Daily's frozen cocktail products when entering the frozen pouch market, and sought to use the Daily's products' success to improve their own. Although this evidence alone is not sufficient to establish secondary meaning, Lanard Toys, Inc., 468 F.3d at 419, the court may infer that such evidence "strongly supports" such a conclusion. Vision Sports, 888 F.2d at 615.

96.     The final factor, which also weighs in favor of a finding of secondary meaning, is evidence of actual confusion. As discussed above, consumers have contacted ABC believing it to be the source of the Parrot Bay frozen cocktail products, and other consumers have done the same with Diageo about ABC's products. At the hearing, defendant's packaging expert also picked up a Daily's frozen cocktail product after he was instructed to pick up the Parrot Bay product. This evidence suggests that consumers can be confused by the packaging design, and therefore weighs in favor of a finding of secondary meaning.

97.     Upon balancing the factors listed above, the court concludes that plaintiffs adduced significant evidence indicating that they are likely to succeed in showing that the trade dress of the Daily's frozen cocktail products has achieved secondary meaning.

### d.     Likelihood of Confusion

98.     The final element of plaintiffs' trade dress infringement and unfair competition claims is evidence that consumers are likely to be confused. A finding of likelihood of confusion requires the court to weigh the factors set forth in Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983) (citing Scott Paper Co., 589 F.2d at 1229). The Lapp factors are:

> (1) the degree of similarity between the owner's [trade dress] and the alleged infringing [trade dress]; (2) the strength of the owner's [trade dress]; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the [trade dress] without evidence of actual confusion arising; (5) the intent of the defendant in adopting the [trade dress]; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

99.     Likelihood of confusion is determined based upon whether "prudent consumers of the type of product in question are likely to be confused as to the source of the goods." <u>Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.</u>, 50 F.3d 189, 200 (3d Cir. 1995). The court must compare the trade dresses by focusing on the "entire look of the product or packaging." <u>Bristol-Myers Squibb</u>, 973 F.2d at 1042.

### i.     Degree of Similarity

100.    The first <u>Lapp</u> factor is perhaps the most important, as it requires the court to determine the degree of similarity between the trade dress on the Parrot Bay/Smirnoff products and the Daily's frozen cocktail products' trade dress. Courts have held "'[i]f the overall impression created by the [trade dress] is essentially the same, 'it is very probable that the marks are confusingly similar.''" <u>Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.</u>, 269 F.3d 270, 281 (3d Cir. 2001) (quoting <u>Opticians Ass'n of Am. v. Indep. Opticians of Am.</u>, 920 F.2d 187, 195 (3d Cir. 1990)). The proper inquiry is whether the two trade dresses create the same overall impression when separately viewed. <u>McNeil Nutritionals</u>, 511 F.3d at 359. If purchasers typically see the two products displayed together, however, a side-by-side comparison is appropriate. <u>Id.</u> In the present case, evidence indicates that both the Daily's and the Parrot Bay and Smirnoff frozen cocktail products are frequently displayed together, often on the same racks or in the same coolers. It is appropriate, therefore, to engage in a side-by-side comparison.

101.    Courts have found that "it is legal error to engage in a 'detailed analysis of the differences in the [trade dresses] rather than focusing on the overall impression created by them . . . it likewise would be legal error to engage in a skewed analysis of the similarities in the trade dresses rather than focusing on the overall impressions they create." <u>Id.</u> at 360 (citing <u>Bristol-Myers Squibb</u>, 973 F.2d at 1046) (internal citation omitted).

102.    Although the prominent presence of a well-known trademark can play an important part in the court's analysis of the first <u>Lapp</u> factor, it may not be treated as an affirmative defense to trade dress infringement. <u>Id.</u> at 361.



103.    In comparing the packaging of the three products displayed above, the court concludes that all three give largely the same overall impression. The overall impression of the three packages is of an hourglass-shaped package with three distinct partitions. At the top, all three pouches share a solid-color band with instructions related to freezing and serving; below that is a large band that comprises most of the center of the package. The most prominent aspect of the packaging is this band, including the centrally-located glass with a frozen beverage in it, surrounded by fruit. This image is common to all three packages. Likewise, the placement of the brand name above the glass in the center partition is the same in all three. The court also finds that the prominent use of the word "ALCOHOL" in the central portion of all three pouches adds to the shared overall impression. The bottom partition in all three packages also gives the same overall impression, wherein it contains the name of the product, as well as the alcohol content information. On all three packages, the partitions are nearly the same size—particularly with respect to the Parrot Bay and Daily's packages. Although the individual brand name differs on

all three packages, it is located in nearly the same place, further contributing to the similarity of the overall impression.

104.    Defendants encourage the court to engage in the detail-oriented analysis discouraged by the Court of Appeals for the Third Circuit in McNeil Nutritionals by pointing to minute details in the bottom portions of the packages. Defendants point out that "the beverage has a malt base (as opposed to a wine base)" and draw a further distinction based upon the "white lines, scrollwork, and elongated diamond patterns" that border the bottom portion on the Diageo packages. These details are so small as to be barely visible in the above photograph, and they certainly do not contribute meaningfully to the overall visual impression of the packaging. Such "'minute differences' 'examined with a microscope'" are not the appropriate way of determining the degree of similarity. McNeil Nutritionals, 511 F.3d at 359 n.2. Moreover, the differences that exist are "minor and subtle," further weakening defendants' argument. Fun-Damental Too, 111 F.3d at 1003.

105.    Defendants argue that the use and placement of the Parrot Bay and Smirnoff trademarks is sufficient to remove any likelihood of confusion, because the brand names are well-known in the alcoholic beverage industry. "The majority of cases hold that labeling an otherwise infringing look-alike product does not prevent infringement." MCCARTHY ON TRADEMARKS, § 8:16. The Court of Appeals for the Third Circuit has taken a slightly more expansive view about whether a brand name can remove a likelihood of confusion, but has done so only in the context where "consumers exercise some care in purchasing" the product. Id. (citing Versa Prods., 50 F.3d at 203 (finding that labeling can eliminate a likelihood of confusion, "except where consumers ordinarily exercise virtually no care in selecting a particular type of product (**as may be the case with inexpensive disposable or consumable items**)" (emphasis added)). As discussed below,

RTD frozen cocktails are exactly the kind of inexpensive, consumable impulse purchase for which consumers exercise little or no care before purchasing—particularly where those products are displayed side-by-side, often mixed together on the same rack or in the same cooler. Because consumers do not exercise care in selecting frozen cocktails, the mere fact that defendants' packages include well-known brand names is not dispositive, and thus the overall impression given by the Daily's, Parrot Bay, and Smirnoff packages is the same. This Lapp factor weighs in favor of finding a likelihood of confusion.

### ii.     Strength of Plaintiffs' Trade Dress

106.    The second Lapp factor also weighs in favor of finding a likelihood of confusion. Part of this assessment requires the court to look at the distinctiveness of the trade dress with respect to the Abercrombie spectrum. Fun-Damental Too, 111 F.3d at 1003. As discussed above, the trade dress of the Daily's products is both inherently distinctive and has acquired secondary meaning in the commercial context.

107.    Courts have also acknowledged that the strength of trade dress is dependent upon the product's "commercial context," and they look to the "'tendency [of the trade dress] to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer.'" Id. (citing Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1226 (2d Cir. 1987)). To the extent that the court has already found that sales of the Daily's frozen cocktail products have exponentially grown, this indicates that the Daily's products not only attracted new customers, but also garnered a significant following since their inception. Defendants do not cite any evidence indicating that this is not the case, leading to the inference that the trade dress of the Daily's products is strong in the commercial context. This factor, therefore, weighs in favor of finding a likelihood of confusion.

### iii.    Price/Care and Attention of Consumers

108.    The third Lapp factor is the price of the products and the care and attention used by

consumers when purchasing those products. Testimony showed that the Daily's frozen cocktail

products and the Smirnoff and Parrot Bay frozen cocktail products retail in the same price range

of less than two dollars—approximately $1.97-$1.99. Barr's testimony indicates that plaintiffs'

and defendants' products are impulse purchases, with a low price point that offers a "low barrier

to purchase" and "enormous . . . appetite appeal." (Aug. 14 Tr. at 186.) The marketing of the

packages further emphasizes the impulsive nature of the purchasing decision. The products are

easy to access, i.e.  they are placed at the ends of aisles and in large dump bins, which allow for a

quick, grab-and-go type purchase. Retailers merchandise the products pre-frozen in freezers so

that they may be quickly consumed. Because the frozen cocktails are an impulse purchase,

consumers do not exercise a great deal of care in selecting which product to buy, or rely heavily

on the brand name when making purchasing decisions.

109.    Defendants counter that brand loyalty is a significant factor in consumers' purchasing

decisions, even in the context of an impulse purchase. In support of this argument, defendants

point to ABC documents and spending on advertising to increase brand awareness. Ward's

testimony, however, indicated that he "look[s] at the marketing money invested . . . to be

indicative that they **certainly think** that brands are important." (Aug. 15 Tr. at 245) (emphasis

added). Ward's testimony does not, however, show that consumers are driven by brand loyalty

when making impulse purchases.

110.    This point is emphasized by looking at both the ABC and the Diageo trade dresses. On all

three packages, the brand name is certainly prominently placed; however, the most predominant

image on all three is the central image displaying an appetizing picture of the product itself, in a

glass, surrounded by fruit. It is also noteworthy that the product's flavor is printed at roughly the same size as the brand name. The court finds, therefore, that although brand may be important, companies marketing impulse-driven products seek to generate what Barr referred to as "an enormous amount of appetite appeal," rather than being purely driven by brand name.

111.   Defendants adduced no evidence that suggests customers use great care in purchasing frozen cocktails. Based upon the lack of care exercised by consumers when making an impulse purchase, the court finds that this factor weighs in favor of finding a likelihood of confusion.

### iv.   Defendant's Intent in Adopting the Trade Dress

112.   As discussed above, ABC presented evidence of intent with respect to defendants' using the merchandising creativity of the Daily's products, and desiring to "copy" the Daily's pouch shape. ABC asserts that defendants sought to capture the overall "value impression" created by the packaging of the Daily's frozen cocktail products. Other evidence indicates that Diageo employees utilized a Daily's product when designing the artwork on the back of defendants' pouch, and tried to "match" the packaging of the Daily's products with respect to the "contains alcohol" notice on defendants' products.

113.   Along with defendants' accelerated design and launch of the Parrot Bay frozen cocktail products, the evidence adduced by ABC could form the basis of an inference that defendants were, at the very least, influenced by the packaging of the Daily's frozen cocktail products in their development process. The evidence, however, largely does not relate to the actual trade dress of the Daily's products, but relates more to the research and development of defendants' products. Although the evidence presented certainly indicates that defendants sought to become a player in the frozen RTD cocktail market and to enjoy success similar to ABC's success, it does not specifically demonstrate that defendants intended to capitalize on the Daily's reputation and

goodwill in an effort to create customer confusion between the two products.[22] <u>Best Cellars, Inc.</u>

<u>v. Grape Finds at Dupont, Inc.</u>, 90 F. Supp. 2d 431, 457 (S.D. N.Y. 2000).  The adduced

evidence does not rise to the level of a finding that defendants intended to copy ABC's overall

trade dress in order to create confusion, and therefore this factor does not weigh heavily in favor

of finding a likelihood of confusion.

### v.     Evidence of Actual Confusion

114.    Evidence of actual confusion is not necessary to prove trade dress infringement under the

Lanham Act, since actual confusion is "'very difficult to prove and the Act requires only a

likelihood of confusion as to source.'" <u>Id.</u> (citing <u>Lois Sportswear, U.S.A. v. Levi Strauss & Co.</u>,

799 F.2d 867, 875 (2d Cir. 1986)).  Despite the known difficulties, ABC presented several

instances of alleged actual customer confusion at the preliminary injunction hearing, which it

argues evidences customer confusion with respect to the source of its products. The evidence

includes two voicemail messages left with ABC and several social media postings suggesting

that the customers believed ABC to be the maker of the Parrot Bay mango product.

115.    The question is whether this evidence is sufficient to weigh in favor of finding a

likelihood of confusion. Defendants argue that much of the evidence is hearsay[23] and that the

court should reject that evidence as being "isolated and idiosyncratic incidents." (ECF No. 96 at

160) (citing, <u>inter alia</u>, <u>Noasha LLC v. Nordic Gp. of Cos.</u>, 630 F. Supp. 2d 544, 558-59 (E.D.

Pa. 2009)). The court agrees with defendants insofar as the evidence presented at the preliminary

injunction hearing is de minimis. This is particularly true in light of the massive number of

---

[22] The evidence of copying was much more persuasive with respect to a finding of secondary meaning, as in that context the evidence of copying only went to whether Daily's was an established brand that a newcomer (Diageo) sought to copy upon entering the market. The present context is distinguishable because plaintiffs have not adduced evidence of intent to deceive customers. <u>See Best Cellars</u>, 90 F. Supp. 2d at 457.

[23] At the hearing, the court indicated that hearsay statements would be admissible for the purpose of a preliminary injunction hearing. (Aug. 14 Tr. at 200). <u>See also</u> <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 718 (3d Cir. 2004) (collecting decisions that have permitted admission of hearsay at a preliminary injunction stage).

Daily's frozen cocktail products that have been sold—more than 122,000,000 units since their launch in 2005. Courts have rejected evidence of misdirected communications, particularly when isolated instances of possible confusion occurred during periods of extremely high sales volumes. ComponentOne, 2008 WL 4790661, at *15-21 (considering a motion for summary judgment). The court acknowledges, of course, that where there is one consumer who believes that ABC produces a mango flavor, there are likely to be others who did not make the effort to contact ABC. ABC's evidence, however, does not demonstrate whether the confusion impacted the consumers' actual purchasing decisions.

116.    The United States District Court for the Southern District of New York has noted that "there is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions." Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 746 (S.D. N.Y. 1997). That reasoning is instructive in the present case. Nearly all the misdirected correspondence referred to the mango flavor (presumably because it is not sold by ABC), and nearly all that feedback was actually positive. When that evidence is considered in conjunction with the ever-increasing sales enjoyed by ABC, it is difficult to infer that purchasing decisions were swayed by that confusion.

117.    As indicated above, the court gave little weight to Lander's survey. The evidence of confusion factor does not weigh in ABC's favor.

### vi.    Channels of Trade and Targeted Consumers

118.    Defendants do not dispute that, with the exceptions related to the retail outlets that are only legally permitted to sell wine-based products as opposed to retail outlets that only may legally sell malt-based products, the targeted consumers for both ABC and defendants are

substantially the same. This factor, therefore, weighs in favor of finding a likelihood of confusion.

### vii.     Relationship of Goods in the Minds of Consumers

119.    This factor requires the court to determine "whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." Checkpoint Sys., 269 F.3d at 286 (citing Fisions Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 481 (3d Cir. 1994)).  As discussed above, the Daily's frozen cocktail products and the Parrot Bay and Smirnoff frozen cocktail products are frequently sold together, often on the same racks or in the same freezers. Defendants argue that the difference in the alcoholic base; i.e. wine or beer, prevents this factor from weighing in favor of confusion. Despite this argument, the court concluded that there is a significant overlap in retailers for both ABC's and defendants' products, and therefore, defendants' argument is without merit. When ABC's and Diageo's frozen cocktail products are sold together there is little doubt that consumers will liken them to each other, insofar as they are all frozen, blender-style cocktails that contain alcohol, and are packaged in a flexible pouch. Other courts have weighed this factor in favor of a likelihood of confusion when comparing products that are far less similar. See Fisions Horticulture, 30 F.3d at 481 (collecting cases, including Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp., 350 F. Supp. 1341 (E.D. Pa. 1972) (finding a close relationship between pipe tobacco and bar accessories with scotch whiskey)). Based upon the similarity in the products and the significant overlap of retailers for both ABC's and defendants' products, this factor weighs in favor of finding a likelihood of confusion.

### vii.     Other Factors

120.    ABC argues two additional points pursuant to the final <u>Lapp</u> factor: (1) defendants'
conduct is likely to cause initial interest confusion; and (2) defendants' conduct is likely to cause
reverse confusion. Defendants do not directly address these arguments in their moving papers.

121.    Initial interest confusion occurs when an alleged infringer uses "an established [trade
dress] to create confusion as to a product's source thereby receiving a 'free ride on the goodwill'
of the established [trade dress]." <u>Checkpoint Sys.</u>, 269 F.3d at 294-95 (citing <u>Mobil Oil Corp. v.
Pegasus Petroleum Corp.</u>, 818 F.2d 254, 260 (2d Cir. 1987)). Initial interest confusion extends
Lanham Act protection to presale confusion with respect to the source of a product. <u>Id.</u> Some
courts have found that initial interest confusion only applies in situations where products are
closely related and consumers use little care in making purchasing decisions. <u>Id.</u> at 296. The
court in <u>Checkpoint Systems</u> applied a similar analysis to the plaintiff's evidence of actual
confusion to their argument of initial interest confusion, and found that evidence of several
misdirected calls and emails was de minimis and not sufficient to show initial interest confusion.

122.    In the present case, ABC did not set forth substantial evidence to support its claim of
initial interest confusion. To the extent that ABC relies upon the same emails and voicemails set
forth in support of its actual confusion claim, the evidence is de minimis and not sufficient to
support a finding of initial interest confusion. To the extent, however, that evidence indicated a
desire by Diageo to recreate the overall value impression of the Daily's package, particularly
with respect to the size and shape of the Parrot Bay and Smirnoff pouches, this could support a
finding of initial interest confusion. The court concludes, therefore, that to the extent that
defendants sought to rely on the Daily's pouch as a way to create a similar product that could
potentially confuse consumers, there is likely to be initial interest confusion. This factor weighs
in favor of finding a likelihood of confusion.

123.    ABC claims that defendants' conduct is likely to cause reverse confusion. Reverse confusion occurs where "a larger, more powerful company uses the [trade dress] of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods and services. Fisions, 30 F.3d at 474 (citing Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992)). A key inquiry with respect to reverse confusion is the relatedness of the products. Checkpoint Sys., 269 F.3d at 302 n.32. As with actual confusion and initial interest confusion reverse confusion requires a showing of more than de minimis evidence. See Id. at 305 (in addressing the plaintiff's argument with respect to reverse confusion, the court of appeals relied upon the district court's finding that there was only de minimis evidence of actual confusion). Likewise in the present case, ABC adduced only minimal evidence of consumer confusion. As discussed above, however, to the extent that ABC presented evidence indicating that defendants sought to copy the overall value impression of the Daily's packaging, and created a package with trade dress that is very similar to ABC's, plaintiffs could make a showing of reverse confusion. It is also noteworthy that the frozen cocktail products in issue are closely related and are frequently sold together—an "integral" consideration with respect to the reverse confusion inquiry. Id. at 302 n.32. The risk of reverse confusion is particularly acute in the present case, where defendants have strong brand recognition associated with their Parrot Bay and Smirnoff brands in the alcoholic beverage industry as a whole. Where a junior user of an allegedly infringing trade dress (like Diageo here) has relatively strong recognition of its brand name, the likelihood that the junior user will "'overwhelm' the marketplace" is much greater. Id. at 303. The court concludes, therefore, that there is a risk of reverse confusion in the present case, and this factor weighs in favor of a finding of a likelihood of confusion.

### e.        Weighing the Factors

124.    Considering all the Lapp factors, ABC established a likelihood of succeeding on the merits of its trade dress infringement claim. Not all the factors weigh in favor of finding a likelihood of confusion, but several of the most important, including the degree of similarity, the strength of plaintiffs' trade dress, and the care and attention of consumers when purchasing weigh heavily in favor of such a finding. Although the evidence of actual confusion does not weigh in plaintiffs' favor, plaintiffs adduced evidence of confusion, and the court observed confusion first-hand. This factor certainly does not weigh against a finding of likelihood of confusion; it is merely not as well supported as the other factors. Plaintiffs' claims of initial interest confusion and reverse conclusion are likewise hampered by a lack of evidence, which courts concede is not necessary and can be very difficult to prove. Best Cellars, 90 F. Supp. 2d at 457. Nevertheless, the other factors do support a finding of both types of confusion. In light of all these factors, and particularly because of the degree of similarity between the trade dress for the Daily's products and the trade dress for the Parrot Bay and Smirnoff products, the court concludes that ABC showed that it is likely to succeed on its trade dress infringement and unfair competition claims.

### D.        Irreparable Harm to Plaintiffs

125.    The Supreme Court has held that a party seeking preliminary injunctive relief must make a "clear showing" that it is at risk of suffering irreparable harm, Winter, 555 U.S. at 22, and the harm shown must be immediate. Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 88 (3d Cir. 1992).

### 1.      *Plaintiffs' Delay*

126.    Defendants' argue that plaintiffs' delay in bringing the present suit belies any finding of irreparable harm. GTE Corp. v. Williams, 731 F.2d 676, 678-79 (10th Cir. 1984) (finding that unnecessary delay can undercut a finding of irreparable harm). The Court of Appeals for the Third Circuit has similarly acknowledged that "*inexcusable* delay could defeat the presumption of irreparable harm [stemming from a finding of a likelihood of success on the merits] in an appropriate case." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 727 (3d Cir. 2004).[24] The Court of Appeals for the Federal Circuit noted that delay in seeking a preliminary injunction "at least suggests that the *status quo* does not irreparably damage" the moving party. Nutrition 21 v. United States, 930 F.2d 867, 872 (Fed. Cir. 1991).

127.    In a case where the plaintiff seeking a preliminary injunction to enforce trademark rights made a showing of a likelihood of success on the merits, the Court of Appeals for the Second Circuit found that a brief ten-week delay precluded injunctive relief. Citibank, N.A. v. Citytrust, 756 F.2d 273, 275-77 (2d Cir. 1985). The court in Citibank rejected the plaintiff's contention that delay resulted because "it was unable to verify that [the defendant] had opened and was operating a New York branch." Id. at 276-77.

128.    Plaintiffs respond that they did not file suit until they received reports of actual confusion, and that any delay is permissible pursuant to the doctrine of progressive encroachment. ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 70 (2d Cir. 2002) (noting that "a plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable

---

[24] As discussed below, the court finds that the presumption applied in Kos Pharmaceuticals is no longer viable in light of the Supreme Court decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006). Pursuant to that finding, the burden is upon plaintiffs to show that they have suffered irreparable harm, regardless whether they have shown a likelihood of success on the merits of their claims. Campbell Soup, 977 F.2d at 91.

infringement claim against defendant"). The doctrine of progressive encroachment is not applicable to this case, however, since it does not apply to situations involving normal business growth. MCCARTHY ON TRADEMARKS, § 31:20 ("[p]rogressive encroachment  denotes some change in direction, such as expansion into different territories or into a different type of business. It must be something more than a normal expansion in quantity within its original line of business that most business will experience over time"). The growth shown by Diageo in the present case from the original test markets to nationwide distribution is exactly the type of growth that is "within [Diageo's] original line of business." Since Diageo is an international corporation that distributes its products across the United States, the fact that the products were rolled out progressively does not negate the reality that the products would ultimately be distributed nationwide. Plaintiffs' early awareness of the Parrot Bay products, therefore, precludes application of the doctrine of progressive encroachment.

129.    Plaintiffs knew about the Parrot Bay frozen cocktail products in June 2011, and had actually seen and been concerned by the packaging in August 2011; yet Murray did not contact Diageo until September 2011. Counsel for PPi waited approximately four months, until December 2011, before sending a cease and desist letter to Diageo, and ABC waited eight months, until April 2012, before contacting Diageo. During that time, plaintiffs had an example of the Diageo packaging—which has not changed since its launch—and had sales data on Diageo's products. ABC admitted to having concerns about the pouch shape used by Diageo, and given the court's finding that the trade dress of ABC's frozen cocktail products and Diageo's frozen cocktail products are essentially the same, it seems unlikely that ABC did not have concerns about the trade dress as well.

130.    This case does not present an instance of a "'fledgling corporation' with a 'relatively low profile'" that would give rise to application of the progressive encroachment doctrine. Id. (citing Lambda Elecs. Corp. v. Lambda Tech., Inc., 515 F. Supp. 915, 923, 930 (S.D. N.Y. 1981)). Instead, the case involves one of the world's largest liquor retailers selling similar products (often in the same flavors) and in essentially the same packaging as plaintiffs.

131.    Plaintiffs' position is further undercut by Murray's statements agreeing explicitly with Lanham's proposal to wait and see if sales of the Parrot Bay products would "take off," thereby increasing the potential settlement value of an infringement suit. (Ex. 53.) Murray responded by stating "[t]hanks and good comments and that is why I am doing very little at this time." (Id.) These statements suggest that plaintiffs' delay was not simply benign neglect, but was instead a tactic calculated to inflict substantial harm on defendants vis-à-vis waiting to file suit until sales increased in anticipation of the peak season for frozen cocktails. This evidence weighs heavily against a finding that plaintiffs' delay was excusable.

132.    When the evidence is viewed as a whole, the court finds that plaintiffs' seven-month delay was inexcusable. Plaintiffs had concerns after seeing the Diageo products and failed expeditiously to protect their rights. These facts, along with the statements made by Murray with respect to delay, lead the court to conclude that the doctrine of progressive encroachment does not apply, and plaintiffs' delay precludes a finding of irreparable harm.

### 2.    *Irreparable Harm*

133.    Even if plaintiffs' delay were not determinative, plaintiffs failed to show that they will be irreparably harmed absent the court's grant of injunctive relief. Irreparable harm includes "loss of control of reputation, loss of trade, and loss of goodwill." Opticians Ass'n of Am., 920 F.2d at 195 (3d Cir. 1990).

134.     When claiming irreparable harm in a patent infringement case, a plaintiff must satisfy

two burdens: first, the plaintiff must show that "absent an injunction, it will suffer irreparable

harm;" and second, the plaintiff must show "a sufficiently strong causal nexus" between the

alleged harm and the alleged infringement. Apple Inc. v. Samsung Elecs. Co., Ltd., 695 F.3d

1370, 1374 (Fed. Cir. 2012).

### a.        Presumption of Irreparable Harm

135.     Courts of appeals had historically applied a rebuttable presumption in preliminary

injunction cases, holding that the irreparable harm element is satisfied upon a showing of a

likelihood of success on the merits. Kos Pharms., 369 F.3d at 726 (holding that "'trademark

infringement amounts to irreparable injury as a matter of law'" (quoting S&R Corp. v. Jiffy Lube

Int'l, Inc., 968 F.2d 371, 378 (3d Cir. 1992))); Bell & Howell Document Mgmt. Prods. Co. v.

Altek Sys., 132 F.3d 701, 705 (Fed. Cir. 1997) (holding that if the plaintiff "clearly established a

likelihood of success, it was entitled to a rebuttable presumption that it would be irreparably

harmed if a preliminary injunction were not to issue"). The Supreme Court, however, recently

held that in the patent context irreparable harm cannot be presumed merely by showing a

likelihood of success on the merits.

136.     Subsequent to the Supreme Court decision in eBay Inc. v. MercExchange, L.L.C., 547

U.S. 388 (2006), patent plaintiffs seeking permanent injunctions are no longer entitled to a

presumption of irreparable harm when they have shown a likelihood of success on the merits of

their claim. Id. at 392-93; see also Robert Bosch LLC v. Pylon Mfr. Corp., 659 F.3d 1142, 1149

(Fed. Cir. 2011) (applying the eBay rule to preliminary injunctions in patent cases).

137.     The Court of Appeals for the Second Circuit followed the eBay rationale and concluded

that the presumption of irreparable harm no longer applies to preliminary injunctions in

copyright cases. Salinger v. Colting, 607 F.3d 68, 78 n.7 (2d Cir. 2010) ("we see no reason that

eBay would not apply with equal force to an injunction in any type of case"); Flexible Lifeline

Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 998-99 (9th Cir. 2011) ("[w]e conclude that

presuming irreparable harm in a copyright infringement case is inconsistent with, and

disapproved by, the Supreme Court's opinion[] in eBay . . ."); Grant Heilman Photography, Inc.

v. John Wiley & Sons, Inc., No. 11-cv-01665, 2012 WL 1080144 (E.D. Pa. Mar. 30, 2012)

(same).

138.    In a recent decision, the United States District Court for the Southern District of New

York likewise followed the eBay rationale and applied it to a motion for a preliminary injunction

in a trade dress infringement case. Tecnimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d 395, 410

(S.D. N.Y. 2011), ("[u]nder the Salinger standard, the court 'must not adopt a 'categorical' or

'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure

from the long tradition of equity practice' was intended by congress)'" (quoting Salinger, 607

F.3d at 80)), aff'd, 462 F. App'x 31 (2d Cir. 2012). The Court of Appeals for the Third Circuit's

holding in Kos Pharmaceuticals predates the eBay decision. While the court of appeals has not

yet had an opportunity to weigh in on that decision's applicability in a trade dress infringement

context, the rationale set forth by the Supreme Court in eBay indicates it applies broadly beyond

the narrow facts of that case: "as in our decision today, this Court has consistently rejected

invitations to replace traditional equitable considerations with a rule that an injunction

automatically follows a determination that a copyright has been infringed." eBay, 547 U.S. at

392-93. The Court of Appeals for the Second Circuit in Salinger commented that the eBay rule

would apply in "any type of case." Salinger, 607 F.3d at 78 n. 7. Following eBay, therefore,

courts sitting in equity are no longer to presume simply that a likelihood of success on the merits

demonstrates irreparable harm. Instead, plaintiffs must demonstrate that the potential harm in absence of an injunction cannot be compensated by monetary damages alone.

139.    The Court of Appeals for the Ninth Circuit, in determining that the rule in eBay applied to motions for preliminary injunctions under the Copyright Act, 17 U.S.C. § 101 et seq., indicated:

> [T]he language of § 502 [of the Copyright Act] is permissive and evokes traditional equitable principles . . . [n]othing in the statute indicates congressional intent to authorize a 'major departure' from 'the traditional four-factor framework that governs the award of injunctive relief' . . . or to undermine the equitable principle that such relief is an 'extraordinary and drastic remedy' that 'is never awarded as of right,' . . . We therefore conclude that the propriety of injunctive relief in cases arising under the Copyright Act must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of pesumptions or a 'thumb on the scale' in favor of issuing such relief.

Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 980-81 (9th Cir. 2011) (internal citations omitted). In the present situation, the injunctive relief provision of the Lanham Act provides "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, **according to the principles of equity and upon such terms as the court may deem reasonable** . . ." 15 U.S.C. § 1116(a) (emphasis added). The Lanham Act, like the Copyright Act, affords district courts broad discretion to apply traditional principles of equity when deciding whether to grant injunctive relief. Like in the Copyright Act, the broad language in the Lanham Act evidences no congressional attempt to depart from traditional equitable principles in permitting injunctive relief.

140.    Accordingly, the court concludes that the Supreme Court's rationale in eBay is applicable in the context of trade dress infringement cases. This conclusion is supported by the decisions of other courts that apply eBay's rationale to preliminary injunctions under both the patent and copyright laws. This conclusion permits the court to apply a uniform equitable standard to

plaintiffs' patent and trade dress claims, which further comports with the principles of equity enunciated in eBay. To the extent, therefore, that the principles articulated in Kos Pharmaceuticals predate the Supreme Court's decision in eBay, this court is obliged to follow the most recent Supreme Court precedent, and will therefore not apply a presumption of irreparable harm to plaintiffs' trade dress and design patent infringement claims.

### b.    Plaintiffs' Irreparable Harm

141.    Because eBay precludes the application of a presumption of irreparable harm, plaintiffs must demonstrate to the court a "'clear showing of a likelihood of immediate irreparable harm'" absent a grant of injunctive relief. Campbell Soup, 977 F.2d at 91.

142.    Plaintiffs cite several examples of alleged irreparable harm. First, ABC claims that it lost market share; second, ABC claims to have had to lay off workers; third, plaintiffs fear that customers will attribute negative qualities to ABC due to alleged problems with the Diageo pouches; and fourth, PPi claims that it will lose credibility if Diageo is allowed to continue using its present pouch shape. With respect to plaintiffs' first two claims of irreparable harm, the court notes that they have only alleged past harms—they produced no evidence indicating that such harms will continue to occur in the future. See id. (rejecting argument that evidence of past harms is sufficient to require preliminary relief). To the extent that prospective equitable relief cannot remedy past harms, those claims of irreparable harm must fail. The court concludes, nevertheless, that even if plaintiffs' claims of harm could be construed as continuing into the future, they are still insufficient to constitute irreparable harm.

143.    Evidence confirms that ABC's market share decreased after Diageo's frozen cocktail products entered the market. Evidence also indicates, however, that ABC's sales of frozen cocktail products increased exponentially during that same time, which makes it difficult to

assess plaintiffs' claims of irreparable harm. The only decision cited by plaintiffs addressing loss

of market share, <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer</u>

<u>Pharmaceuticals Co.</u>, 290 F.3d 578 (3d Cir. 2002), is inapposite to the present case. In <u>Novartis</u>,

the Court of Appeals for the Third Circuit noted that lost market share can constitute irreparable

harm, but limited that conclusion to cases involving a "competitive industry where consumers

are brand-loyal." <u>Id.</u> at 596. This holding directly contradicts the evidence offered by plaintiffs in

the present case, which strongly indicates a lack of brand loyalty.

144.    The <u>Novartis</u> decision is also distinguishable because evidence in that case showed a

measurable decrease in the plaintiff's sales, which corresponded to sales increases for the

defendant. <u>Id.</u> In the present case, ABC's sales of the Daily's frozen cocktails continued to

increase at an exponential rate despite Diageo's entry into the market.[25] The evidence adduced

by plaintiffs reinforces the success of the Daily's frozen cocktail products and does not reflect

the kind of immediate irreparable harm necessary to warrant injunctive relief. ABC also did not

point to any evidence indicating that it will continue to lose market share in the future, as would

be necessary to necessitate injunctive relief.

145.    Defendants counter plaintiffs' argument by noting that any monetary damages assessed

can be calculated, and that Diageo is able to satisfy any judgment rendered against it. Courts

have determined that loss of market share is not too ephemeral for monetary damages to be

calculated:

> "[N]either the difficulty of calculating losses in market share, nor speculation that
> such losses might occur, amount to proof of special circumstances justifying the
> extraordinary relief of an injunction prior to trial. . . . Indeed, the district court's
> reliance on possible market share loss would apply in every patent case where the
> patentee practices the invention. Moreover, [defendant] is acknowledged to be a

---

[25] To the extent that ABC argues that its sales at Wal-Mart declined, the court already concluded that ABC did not adequately show that the decrease is attributable to Diageo's entry into the market, as opposed to ABC's inability to keep up with the increased demand for its products.

large and financially responsible company which would be answerable in damages."

Altana Pharma AG v. Teva Pharms. USA, Inc., 532 F. Supp. 2d 666, 683 (D. N.J. 2007) (quoting Nutrition 21, 930 F.2d at 871) (alterations in original), aff'd, 566 F.3d 999 (Fed. Cir. 2009). In the present case, plaintiffs set forth no evidence indicating that the court could not calculate monetary damages. See Sampson v. Murray, 415 U.S. 61, 90 (1974) ("'[t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy . . . are not enough.'" (quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958)). Without evidence indicating that it would be extremely difficult—if not impossible—to calculate the monetary value attributable to ABC's loss in market share, the court cannot simply assume, based upon one citation, that the harm to ABC is irreparable. Diageo is a worldwide, multibillion dollar corporation that is more than capable of paying any amount of damages awarded to plaintiffs. Without evidence supporting ABC's claim that loss of market share alone constitutes irreparable harm, the court cannot agree with plaintiffs that loss of market share constitutes irreparable harm.

146.    With respect to plaintiffs' argument that ABC's reputation could be harmed due to quality issues related to the Diageo's frozen cocktail products, this argument is speculative and not supported by evidence. The two photographs plaintiffs present to support their claim that the Diageo pouches leak, Exhibits HH, and II, reflect de minimis circumstances, and are not sufficient to show irreparable harm in light of the enormous number of frozen cocktail products that have been sold. To the extent plaintiffs offered other evidence of consumers' responses to Diageo's frozen cocktail products, that evidence further contradicts plaintiffs' claims of harm insofar as nearly all the alleged instances of confusion involved consumers who were pleased

with the Parrot Bay mango flavor. Isolated incidents of purportedly leaking packages without any actual evidence of consumer dissatisfaction are insufficient to show irreparable harm.

147.   With respect to plaintiffs' argument that ABC had to lay off workers "due to declining sales," (ECF No. 95 at 39), this argument is contradicted by plaintiffs' own evidence, since sales of the Daily's frozen cocktail products subsequent to Diageo's entry into the market exponentially increased. Plaintiffs did not indicate whether any additional layoffs will occur absent injunctive relief. Swings in seasonal demand are also likely with respect to these products, as testimony indicated that sales increase greatly during warm weather periods in the summer and decrease during the winter. Barr's unsupported statement that ABC had to lay off workers because it "didn't get the sales [it] had anticipated," (Aug. 14 Tr. at 190), does not adequately explain whether the layoffs were a result of Diageo's entry into the market, or simply decreased demand due to the seasonal nature of frozen RTD beverages. Without further support for their claims of irreparable harm, the court concludes that plaintiffs failed to make a sufficient showing.

148.   Under controlling Federal Circuit law, plaintiffs' claims of irreparable harm with respect to design patent infringement fail for an additional reason because they are unable to satisfy the nexus requirement set forth in <u>Apple v. Samsung</u>. The court in <u>Apple v. Samsung</u> required the plaintiff to show a nexus between the alleged infringement and the alleged irreparable harm. 678 F.3d at 1324. In short, "[s]ales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product." <u>Id.</u>

149.    Plaintiffs offered no evidence establishing a connection between the shape of the Daily's pouch in issue and purchasing decisions.[26] Plaintiffs' overall argument is, in fact, just the opposite—they maintain that frozen RTD pouches are impulse purchases made predominantly based upon price and "appetite appeal," not the pouch shape. Other evidence supports this conclusion; specifically, the prominent display on the packaging of an appetizing image of the beverage and the flavor. Consumer feedback cited by plaintiffs all relates to the flavor of the beverages, not the shape of the pouch. Plaintiffs' moving papers fail to address the nexus requirement, and to the extent that their own evidence undercuts a showing of that nexus, the court concludes that plaintiffs failed to adduce sufficient evidence to show that they will suffer irreparable harm in the absence of an injunction.

### E.    Harm to Defendants

150.    The parties spend little time addressing the potential harm to defendants if an injunction were to issue, and focus largely on the amount of time it would take Diageo to change the shape of the pouch it will use. Diageo asserts six months; Murray asserts three months. Plaintiffs maintain that any harm suffered by Diageo is harm that it brought upon itself, and should therefore not weigh heavily in the court's equitable relief calculus. As indicated above, however, the court concludes that Diageo is more than capable of remedying any harm suffered by plaintiffs by way of money damages. This factor, therefore, weighs slightly in favor of denying plaintiffs' motion.

### F.    Public Interest

---

[26] Barr did indicate, in response to a question about the Parrot Bay frozen cocktail products, that "[t]he consumer buys it based on the shape of the product and price." (Aug. 14 Tr. at 192.) This statement—which was made in reference to the Parrot Bay products, and not the Daily's products—is wholly unsupported and contradicts Barr's earlier statement that consumers "just buy[] it based on price. Price is a major component." (Id. at 187.)

151.     The final element that the court must consider is the public interest. At the outset, the court is aware that the public interest often favors the enforcement of patent and trade dress rights. S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992) (enforcing trademarks serves the public interest); Hybridtech, 849 F.2d at 1458 ("although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief"). Language in the Jiffy Lube decision indicates that since the court found a likelihood of success with respect to infringement, the public interest factor would favor equitable relief as a matter of course. As indicated in the discussion above, however, no one factor in the equitable relief calculus is presumed to be satisfied merely because another factor was satisfied. Consequently, the court will not presume that the public interest favors granting injunctive relief in the present case.

152.     With respect to a critical public interest that could be harmed by granting injunctive relief, the court is cognizant of the potential impact on the market that will result from granting plaintiffs' requested relief—namely, that consumers will have fewer choices in the marketplace. Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 827 (9th Cir. 1993) (affirming a finding that the public interest would not benefit because granting injunctive relief would deprive consumers of a choice of products). In light of this consideration, and based upon the court's conclusion that any harm from infringement can be adequately compensated by monetary damages, the court concludes that the interest of consumers in having a choice of products (particularly the mango product which appears to be quite popular and is not made by ABC), the public interest weighs slightly in favor of denying plaintiffs' motion.

## IV.     BALANCING OF FACTORS

153.    In the present case, the court concludes that the equitable factors weigh in favor of denying the relief sought by plaintiffs. Although plaintiffs showed that they are likely to succeed on the merits, they did not show that money damages would be insufficient to remedy any resulting harm. A decision in favor of plaintiffs could deprive the public of choices in the market for several months. Plaintiffs did not provide sufficient evidence to support their claims of irreparable harm; and defendants would suffer lost sales and profits for several months. The court in weighing the factors gives greater weight to the determination that any damages awarded to plaintiffs can be compensated by Diageo, which is a financially strong market leader in the beverage industry enjoying billions of dollars in sales worldwide.

## V.    **CONCLUSION**

For the reasons set forth above, the court concludes that plaintiffs' motion for a preliminary injunction is denied. An appropriate order follows.

March 28, 2013

BY THE COURT:

/s/  Joy Flowers Conti
Joy Flowers Conti
United States District Judge